UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
: 
In re:                                      :     Chapter 15
                                            :
TRANSFIELD ER CAPE LIMITED (BVI)            :     Case No. 10-_____ (___)
                                            :
              Debtor in a                   :
              Foreign Proceeding.           :
                                            :
                                            :
---------------------------------------------------x

### DECLARATION OF CASEY MCDONALD PURSUANT TO 11 U.S.C. § 1515 IN SUPPORT OF (1) PETITION FOR ENTRY OF AN ORDER RECOGNIZING FOREIGN MAIN PROCEEDING AND GRANTING FURTHER RELIEF; AND (2) APPLICATION FOR PROVISIONAL RELIEF

CASEY MCDONALD, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States, as follows:

1.      I am one of the joint liquidators (the "Joint Liquidators" or "Petitioner") of Transfield ER Cape Limited (BVI) ("TERC" or the "Foreign Debtor")), a company undergoing liquidation before the Commercial Division of the High Court of Justice (the "BVI Court"), case number BVIHCV2010/21 (the "BVI Liquidation"), pursuant to the Insolvency Act of 2003 of the British Virgin Islands (the "2003 Act").[1]

2.      I respectfully submit this declaration in support of (i) the Joint Liquidators' petition seeking recognition of the BVI Liquidation pursuant to either 11 U.S.C. §1517(b)(1) or (2) as a foreign main or foreign nonmain proceeding, and (ii) Petitioner's Ex Parte Application for Provisional Relief Under 11 U.S.C. §§1519(a) and 1521(a) (the "Application").

---

[1] Relevant provisions of the 2003 Act are annexed as Exhibit 1 to the Declaration of Sandie Corbett ("Corbett Declaration"), filed together with this declaration.

3.      I am a director of KPMG (BVI) Limited, and I am duly authorized to make this declaration on behalf of the Joint Liquidators of TERC. KPMG is an international accounting firm with offices throughout the world and has substantial experience in accounting and insolvency matters. Unless otherwise indicated, all statements contained herein are true and based upon personal knowledge or my review of relevant documents.

4.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on 15 December 1997 (the "Model Law").

5.      I am also familiar with the Cross Border Insolvency Regulations of 2006 (the "2006 Regulations"), which gives effect to the Model Law in Great Britain, and Part XVIII of the 2003 Act, which gives effect to the Model Law in the BVI. I understand that the 2006 Regulations, Part XVIII of the 2003 Act, and Chapter 15 of the U.S. Bankruptcy Code are all based upon the substance of the Model Law.

6.      Pursuant to the 2003 Act, court-appointed liquidators - such as myself - are officers of the BVI Court. *See* 2003 Act §184, Corbett Declaration, Ex. 1 (providing that a liquidator in a BVI liquidation proceeding acts as an officer of the BVI Court). Therefore, I make this declaration as an officer of the BVI Court, and request an extension of comity for the benefit of all TERC creditors, whose interests I also represent.

7.      On September 30, 2010, the BVI Court issued an order directing that (i) TERC would be wound up by the BVI Court in accordance with the provisions of the 2003 Act, and (ii) appointing Bob Yap Cheng Ghee of KPMG Singapore, Patrick Cowley of KPMG Hong Kong, and myself, as Joint Liquidators of TERC (the "Liquidation Order"). A true and correct copy of the Liquidation Order is attached hereto as Exhibit 1.

8.    I am performing my duties as Liquidator of TERC in and from the BVI, which is where I reside.

9.    For the reasons discussed below, I believe that: (i) the Joint Liquidators qualify as a "foreign representative" of the BVI Liquidation, and the BVI Liquidation constitutes a "foreign proceeding" as per 11 U.S.C. §§101(23) and (24), respectively; (ii) this case was properly commenced in accordance with the requirements of chapter 15; (iii) the BVI Liquidation is a "foreign main proceeding" within the meaning of 11 U.S.C. §§ 1502(4) and 1517 (b)(1); (iv) that TERC is engaged in non-transient economic activity in the BVI; and (v) preliminary relief is of the utmost importance and warranted here.

10.    In addition, and as set forth in the Application, I submit that the requested provisional relief is necessary in order to maintain the status quo. In particular, a stay of the U.S. actions against TERC and its assets pending a decision on recognition is required to prevent dissipation, seizure, attachment, restraint and or enforcement against property of TERC in the United States, to prevent burdensome discovery requests, and to prevent certain creditors' stated intention to attempt execution on TERC's extra-territorial (non-United States) assets under the control of the BVI Liquidation, and otherwise interfere with TERC Liquidation relationships with entities subject to New York jurisdiction. I am advised that this relief is specifically permitted under 11 U.S.C §§1519 and 1521(a), and that these circumstances warrant such relief.

## TERC'S BUSINESS

11.    TERC was incorporated under the laws of the British Virgin Islands on May 22, 2003. True and correct copies of TERC's memorandum and articles of association and certificate of incorporation are attached hereto as Exhibit 2. TERC's registered office is at TrustNet (BVI)

3

Ltd. ("Trustnet"), TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands.

12.    TERC is a time-charter operator of bulk cargo ships and was a major player in the world-wide transportation of bulk commodities such as iron, coal and steel. In 2007, during the height of the global commodities boom, TERC maintained in excess of 200 vessels under charter.

13.    In 2008, the market for transportation of bulk cargo suffered a dramatic collapse as a result of the global economic downturn; the Baltic Dry Index, which measures average global freight prices for the transportation of bulk goods, collapsed. Both the price of carrying bulk goods and the demand for carriage of bulk goods dropped significantly. As a result, TERC's profitability deteriorated from the period of late-2008 onwards.

14.    TERC's counterparties consist of a broad swath of internationally-based ship-owners, commodity traders, cargo shippers and other time-chartered operators similar to TERC. A number of these time-chartered operators, including Britannia Bulk PLC, Britannia Bulkers A/S, and Armada (Singapore) Pte Ltd., faced similar financial difficulties. Insolvency proceedings were commenced with respect to these entities in their home jurisdictions, which proceedings, I understand, were recognized as foreign-main proceedings in the United States pursuant to chapter 15. Additionally and consequently, TERC thereafter suffered a bad debt in the amount of $175 million.

15.    TERC's business has always been a "paper business." TERC never actually owned vessels, but rather chartered them from owners or disponent owner (before sub-chartering them out). To the best of my knowledge, TERC has never owned any physical assets in any location.

4

16.     TERC is now insolvent on a cash flow and balance sheet basis. Attached hereto as Exhibit 3 are financials statements prepared by TERC (pre-liquidation) and my staff (post-liquidation)[2] (the "Financial Statements").

17.     According to the Financial Statements, TERC presently maintains assets of approximately $273,121,039.00 and liabilities of $432,029,531.00. My staff has preliminarily investigated these reported assets and liabilities and arrived at substantially reduced estimated realization figures for both assets and liabilities.

18.     A large portion of TERC's assets consist of claims against third parties, while the remainder consists of *inter alia*, bank balances in the BVI under the control of the Petitioner, approximately $33 million in future profits (contingent receivables) pursuant to ongoing time charters through 2013, and funds in the United States which are presently subject to restraint by maritime attachment orders. I understand that the funds restrained in the U.S. may be in jeopardy of additional and further restraint.

### The TERC Liquidation and BVI Insolvency Law

19.     On September 3, 2010, a creditor of TERC, TMT Bulk Corporation, trading as TMT Bulk Co. Ltd. ("TMT"), applied to the BVI Court for the making of a winding-up order against TERC and the appointment of a liquidator (the "Liquidation Application").

20.     On September 30, 2010 the BVI Court directed that TERC be placed in Liquidation. *See* Exhibit 1, The Liquidation Order.

21.     I am advised that the Liquidation Order represents the commencement of a foreign proceeding as defined in 11 U.S.C. 101(24).

---

[2] KPMG's analysis contains a revised estimate of what it presently considers to be the "realizable" value of KPMG's assets.

22.     As set forth in Section 185(1)(a) of the 2003 Act, a liquidator appointed under the 2003 Act is required to take possession of, protect and realize the assets of the company, wherever they may be located, for the benefit of creditors.

23.     Pursuant to §175(1)(b) of the 2003 Act, upon commencement of the BVI Proceedings, the directors and officers of the Foreign Debtor cease to have any power. Section 175 of the BVI Act provides that, upon commencement of a liquidation proceeding, "the directors and other officers of the company remain in office, but they cease to have any powers, functions or duties other than those required or permitted by [Part VI of the 2003 Act]." *See* Corbett Declaration Exhibit 1

24.     In practice, aside from their residual power to contest the liquidation (which has not been exercised here to the best of my knowledge) the directors of TERC ceased to have all powers upon the appointment of the Joint Liquidators. Similarly, the responsibility for the management of TERC has been vested with the Joint Liquidators Liquidator, subject to the BVI Court supervision.

25.     The BVI Liquidation is not for the benefit of any single creditor. Rather, it operates to resolve and determine the rights of all claimants and stakeholders vis-à-vis the Foreign Debtor. *See, e.g.,* Corbett Declaration Exhibit 1, 2003 Act §207 (providing for the payment of classes of admitted claims and expenses in accordance with statutory priorities, and if the amount available for such claims is insufficient to pay claims in full, directing ratable payment by class). Any person or entity with a claim against TERC may assert such claim in the BVI Liquidation.

26.     The 2003 Act and the Liquidation Order together enumerate the Joint Liquidators' powers.    The Joint Liquidators are empowered to carry out all the functions and duties of a liquidator under the 2003 Act including the power to:

a.  Pay any class of creditors in full.

b.  Make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the company, whether present or future, certain or contingent, ascertained or not.

c.  To compromise, on such terms as may be agreed

   i.  Calls and liabilities to calls, debts and liabilities capable of resulting in debts, and claims, whether present or future, certain or contingent, ascertained or not, subsisting or supposed to subsist between the company and any person; and

   ii.  Questions in any way relating to or affecting the assets or the liquidation of the company;

   iii.  And take security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect of it.

d.  To commence, continue, discontinue or defend any action or other legal proceedings in the name and on behalf of the company in the British Virgin Islands and elsewhere.

e.  To carry on the business of the company so far as may be necessary for its beneficial liquidation.

f.  To sell or otherwise dispose of property of the company.

g.  To do all acts and execute, in the name and on behalf of the company, any deeds, receipts or other document.

h.  To use the company's seal.

i.  To prove, rank and claim in the bankruptcy, liquidation, insolvency or sequestration of any member or past member for any balance against his estate, and to receive dividends, in the bankruptcy, liquidation, insolvency, sequestration or in respect of that balance, as a separate debt due from the bankrupt or insolvent, and rateably with the other separate creditors.

j.  To draw accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the company with the same effect with respect to the

7

company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business.

k. To borrow money, whether on the security of the assets of the company or otherwise.

l. To take out in his official name letters of administration to any deceased member or past member or debtor, and to do any other act necessary for obtaining payment of any money due from a member or past member or debtor, or his estate, that cannot conveniently done in the name of the company.

m. For the purpose of enabling the Liquidators to take out letters of administration or do any other act under this paragraph, to be due to the Liquidators themselves.

n. To call meetings of creditors or members for

    i. The purpose of informing creditors or members concerning the progress of matters arising in the liquidation;

    ii. The purpose of ascertaining views of creditors or members on any matter arising in the liquidation; or

    iii. Such other purpose connected with the liquidation as the Liquidators consider fit.

o. To appoint a solicitor, accountant or other professionally qualified person to assist him in the performance of his duties.

p. To appoint an agent to do any business that the Liquidators are unable to do themselves, or which can be more conveniently done by an agent.

q. To apply to the Court for directions concerning any matter arising out of the exercise of the above powers.

r. To do all other things incidental to the exercise of the above functions and powers.

27.    BVI Court approval must be sought before the Joint Liquidators can exercise any of the first five powers (listed at paragraphs 26 (a)-(e)). *See* Liquidation Order at 2; 2003 Act §186(3). The other powers enumerated in the Liquidation Order may be exercised without specific, prior BVI Court approval, but are always subject to BVI Court review.

28.    I am advised that the powers of the Joint Liquidators are broadly comparable to those of a trustee under Chapter 7 of the United States bankruptcy code. However, the Joint

Liquidators are further empowered to continue the operations TERC as necessary, including the continuation of its various profitable charters, and to maximize the value of the estate for creditors. For example, the Joint Liquidators have obtained the sanction of the BVI Court to continue with certain profitable charter agreements and regular hire payments are received into the Joint Liquidators' BVI bank account from sub-charterers, and corresponding onward hire payments are then made by the Liquidators to the vessel owners.

29.     Under the 2003 Act, a liquidator is also empowered to promote a Company Creditor Arrangement ("CCA"), which, I am advised, is broadly comparable to a plan of reorganization in the United States.

30.     I have obtained an order of the BVI Court authorizing the continuation of TERC's business for the benefit of winding up, and maximizing the value of the estate, but have not yet determined whether a CCA will be beneficial and/or necessary.

31.     I have further obtained orders of the BVI Court authorizing the Liquidator to Petition the Courts of the United States of America and the United Kingdom for recognition of the BVI Liquidation (the "BVI Court Foreign Recognition Orders"). Attached hereto as Exhibit 4 are true and correct copies of the BVI Court Foreign Recognition Orders.

32.     The Liquidation of TERC is taking place largely in the BVI. Although the Joint Liquidators are based in three different jurisdictions (the BVI, Hong Kong, and Singapore), a significant proportion of the work to date relating to the liquidation (and post-liquidation activities) has been conducted in the BVI and all of the work is subject to the supervision of the BVI Court.

33.     A bank account was established in the BVI to handle TERC's receivables from ongoing charters and otherwise receive payments in connection with the realization of claims against third parties, as well as make payments due under the continuing charter agreements.

34.     The Joint Liquidators also reached an agreement with TERC debtor, Crownland International Co. Ltd. ("Crownland"), whereby Crownland settled its debt to TERC in exchange for TERC releasing certain Crownland funds from Rule B attachment in New York. The Crownland settlement payment was paid to the TERC bank account in the BVI.

35.     The first meeting of creditors was held in the BVI on October 20, 2010. While a number of creditors (via their respective BVI legal counsel) attended the meeting in person, facilities were also made available for overseas creditors, to attend the meeting telephonically. I will be calling and supervising additional periodic creditor meetings. These meetings will likely occur in the BVI, but could conceivably be held elsewhere if the creditors collectively so choose. To the extent such meetings are held in the BVI, it will be possible to participate telephonically for the convenience of creditors.

36.     I have also been closely involved in the continuing the operation of TERC's business from the BVI. My responsibilities include negotiating with various owners, disponent owners and sub-charterers to prevent them from breaching TERC's on-going and still-profitable charters and contracts of affreightment; as well as dealing with creditor's queries. These various contracts are expected to generate $33 million in profits by 2013.

37.     Mr. Cowley, another joint liquidator based in Hong Kong, has been gathering information and liaising with TERC's agent there. Mr. Cowley and I are working together on Liquidation, and Mr. Cowley generally acts in relation to Liquidation issues where the relevant counter party is based in Asia. This is primarily for the purposes of efficiency in light of the

substantially different zones between the British Virgin Islands and Asia. Mr Yap, a joint liquidator based in Singapore, has been dealing with TERC's creditor in Singapore and the ancillary Singapore action described below. He is further tasked with handling the liquidation in relation to TERC's claims against Armada Singapore Pte Ltd., which is itself undergoing insolvency proceedings in Singapore.

38.     As described above, all of the actions undertaken by Mr. Cowley and Mr. Yap in connection with the BVI Liquidation from their respective locations (Hong Kong and Singapore), are subject to the supervision and/or require approval of the BVI Court.

## The United Kingdom Recognition Proceeding

39.     Before the BVI Liquidation commenced a number of TERC's counterparties instituted arbitration and court proceedings in London in accordance with the terms of various charter parties and contracts of affreightment between them.

40.     To prevent these actions from disrupting the BVI Liquidation, in October 27, 2010, the Liquidator made an application to the English High Court of Justice, Chancery Division, for recognition of the BVI Liquidation as foreign main proceeding pursuant to British statute implementing the Model Law on Cross-Border Insolvency, the Cross Border Insolvency Regulations of 2006.

41.     On November 1, 2010, the English Court recognized the BVI Liquidation as a foreign main proceeding and granted all of the relief requested (the "English Recognition Order"). A true and correct copy of the English Recognition Order is attached hereto as Exhibit 5.

11

## The Ancillary Singapore Proceeding

42.     Singapore has no statutory or common law mechanisms for the recognition of foreign insolvency proceedings.

43.     On October 15, 2010, (two weeks after the BVI Liquidation Order was issued), the Singapore Court made a winding up order in respect of TERC and appointed the same Joint Liquidators (myself, Mr. Cowley, and Mr. Yap) as liquidators in respect of the Ancillary Singapore Liquidation (the "Singapore Order"). A true and correct copy of the Singapore Order is attached hereto as Exhibit 6. The petitioning creditor and Singapore Court agreed that a unified process would be most expeditious and efficient.

44.     In the Ancillary Singapore Liquidation, the liquidators will realize the assets based in Singapore and make payment to local preferential creditors, which (i) I understand will consist solely of the petitioning creditor and (ii) will be limited to the costs of the petition and the ancillary, Singapore proceeding.

45.     After said deduction, the balance of whatever assets of TERC are realized in Singapore will be transferred to the BVI for distribution to creditors in the BVI Liquidation.

## The Actions Against, and Assets of, TERC in the United States

46.     To the best of my knowledge, there are presently five legal proceedings in the United States, against TERC, all of which are based in New York. They are: (i) *China Earth Shipping Inc. v. Transfield ER Cape Limited,* Index No. 650621-2010 (N.Y. Sup. Ct.) (the "China Earth" Action); (ii) *China Sun Shipping Inc. v. Transfield ER Cape Limited* Index No. 650622-2010 (N.Y. Sup. Ct.) (the "China Sun Action"); (iii) *Constellation Energy Commodities Group Inc. v. Transfield ER Cape Ltd. and Transfield ER Ltd.* No. 10-cv-4434 (SHS) (S.D.N.Y.)

(the "Constellation Action"); (iv) *Jade Navigation S.A. v. Transfield ER Cape Ltd.*, No. 10-cv-4899 (S.D.N.Y.) (AKH) (the "Jade Action"); and (v) *TMT Bulk Co. Ltd. v. Transfield ER Cape Ltd. and Transfield ER Ltd.*, No. 10-cv-5110 (JSR) (S.D.N.Y.) (the "TMT Action").

47.     The China Earth Action seeks recognition and enforcement of a Hong Kong default judgment against TERC in the amount of $7,430,561.00. TERC has filed a motion to dismiss the matter on the grounds of lack of personal jurisdiction and *forum non conviens*. The China Earth motion to dismiss is *sub judice*.

48.     The China Sun Action seeks recognition and enforcement of a Hong Kong default judgment against TERC in the amount of $42,175,980.00. TERC has filed a motion to dismiss the matter on the grounds of lack of personal jurisdiction and *forum non conviens*. The China Sun motion to dismiss is *sub judice*.

49.     The Constellation Action seeks recognition and enforcement of a London Arbitration award in the amount of $7,577,600.00. TERC filed a motion to dismiss the matter on the grounds that the award was not yet final, that the petition seeks enforcement against a party that is not a signatory to the arbitration agreement, and on the ground of *forum non conviens*. The Constellation motion to dismiss is *sub judice*.

50.     TERC is the beneficial owner of a bank balance in the amount of $866,377.36, which sum is held in an escrow account at J.P. Morgan Chase Bank, N.A. ("JP Morgan") in New York (the "Escrow Account").

51.     I understand that in the now-dismissed matter of *Front Carriers v. Transfield ER Cape et. al,* 07-cv-6333 (S.D.N.Y.), plaintiff Front Carriers attached $15,101,338.00 million in "electronic funds transfers" ("EFTs") as security for Front Carriers' then-ongoing arbitration

against TERC in Paris, France.[3] TERC demanded (and obtained) counter-security for its counterclaim in the Paris Arbitration from Front Carriers in the amount of $5,210,280.

52. I understand that Front Carriers and TERC resolved to place the security and counter-security in escrow accounts at J.P. Morgan, for among other reasons, so that the parties could earn interest on the security while the Paris Arbitration progressed.

53. On June 17, 2010, the Paris Arbitration Panel entered an award against TERC in the amount of $5,945,530 (plus interest), and denied TERC's counterclaims against Front Carriers. Accordingly, I understand that Front Carriers' posted security was released, and TERC paid Front Carriers the amount of the arbitration award from the Escrow Account as agreed. The remainder of the security obtained by Front Carriers, approximately, $9.9 million, was to be released to TERC.

54. I understand that before any release to TERC could be effectuated by J.P. Morgan, TERC creditor Jade filed the Jade Action.

55. Specifically, Jade filed a verified complaint against TERC seeking a Rule B attachment in support of its claims against TERC in London Arbitration. On June 25, 2010, Jade obtained an Order authorizing Rule B attachment in the amount of $866,377.36 (the "Jade Rule B Attachment Order"). A true and correct copy of the Jade Rule B Attachment Order is attached hereto as Exhibit 7.

56. I understand that Jade served its Rule B Attachment Order upon J.P. Morgan on or about that same day. I further understand that J.P. Morgan is presently restraining TERC's funds in the Escrow Account in the amount of $866,377.36 pursuant to the Jade Rule B

---

[3] At the time the funds were attached, I understand it was permissible to attach EFTs pursuant to Rule B of the Supplemental Rules for Admiralty Claims of the Federal Rules of Civil Procedures - however this practice is no longer permitted. *See Shipping Corporation of India v. Jaldhi Overseas Pte Ltd.,* 585 F.3d 58 (2d. Cir. 2009).

Attachment Order. To the best of my knowledge, the remainder of the Escrow Account funds were released.

57. On August 13, 2010, TERC filed a motion to vacate the Jade Rule B attachment order *inter alia*, on the ground that the attachment was invalid *ab initio*. Jade made a motion for discovery in connection with TERC's motion to vacate. Both the vacatur motion and the discovery motion in the Jade Action are *sub judice*.

58. TERC creditor TMT also filed a verified complaint against TERC seeking Rule B attachment as security for its London arbitrations against TERC. The Court issued an order authorizing Rule B attachment of TERC funds in escrow at J.P. Morgan Chase on July 6, 2010 (the "TMT Rule B Attachment Order"), which order I understand was served upon J.P. Morgan Chase. A true and correct copy of the TMT Rule B Attachment Order is attached hereto as Exhibit 8.

59. On August 17, 2010, TERC filed a motion to vacate the TMT Rule B Attachment Order, *inter alia,* on the ground that the attachment was invalid *ab initio*. TMT filed an opposition on September 3, 2010 and a reply was submitted by TERC on September 10, 2010.

60. On November 8, 2010, TERC's motion to vacate the TMT Rule B Attachment Order was granted in its entirety (the "TMT Vacatur Order"). A true and correct copy of the TMT Vacatur Order is attached hereto as Exhibit 9. The TMT Vacatur Order states that "final judgment dismissing the Complaint will not be entered until the Court issues an opinion setting forth the reasons for this ruling. In the interim, further proceedings in this case are stayed."

### Qualifications for Recognition

61. I am aware of the meaning of "foreign proceeding" as defined in 11 U.S.C. 101(23) of the Bankruptcy Code. I am advised by U.S. counsel and verily believe that the BVI

Liquidation qualifies as such because the BVI Liquidation is a judicial proceeding under the supervision of the BVI Court in which the rights of creditors and stake-holders will be determined together, pursuant to the 2003 Act, which is a law relating to insolvency and adjustment of debts.

62.     I am aware of the definition of "foreign representative" as defined in 11 U.S.C. 101(24) of the Bankruptcy Code. I am advised by U.S. counsel and verily believe that the Joint Liquidators qualify as such because they are duly authorized and empowered by the BVI Court to administer the liquidation of TERC's assets and affairs, as well as to act as duly authorized representatives of the BVI Liquidation proceeding internationally.

63.     I also am aware that "foreign court" is defined in Section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I do not believe it is questionable that the BVI Court qualifies as a "foreign court." Furthermore, as noted above, the BVI Court exercises direct control over the BVI Liquidation.

64.     Finally, I am aware of the requirements for recognition as a foreign main and non-main proceeding under Section 1517(b)(1) and (2) of the Bankruptcy Code. I believe that the BVI Liquidation qualifies as a main proceeding, and that the BVI is TERC's center of main interests ("COMI"). I further believe that TERC is engaged in non-transient economic activity in the BVI.

65.     As noted above, TERC was formed under the laws of the British Virgin Islands and maintains its registered office there. I am advised that under U.S. law, this fact supports a statutory presumption that the BVI is TERC's COMI.

66.     Furthermore, I believe that there is no basis for rebutting this statutory presumption and that the circumstances clearly indicated that the BVI is TERC's COMI.

67.     As an initial matter, substantial TERC assets - including almost all of its known liquid assets (TERC's bank account balance) - are located in the BVI. I understand that there are immaterial balances held in an account in TERC's name in both Singapore and Hong Kong.

68.     Similarly, the bank account which will be used to collect TERC receivables from ongoing charters is in the BVI, and TERC's books and records are located in the BVI.[4]

69.     TERC's ongoing business value primarily consists of (intangible) rights in charter parties and contracts of affreightment. I am advised that under New York law, the situs of intangible property is where the owner of the intangible property may be found. Here, it is clear that TERC (in liquidation) is found in the BVI. The Joint Liquidators have displaced the board of directors of TERC, TERC is in liquidation before a BVI Court, and all creditors of TERC may submit their claims in the BVI Liquidation. Moreover, TERC's ongoing business is being conducted from the BVI.

70.     TERC maintains claims against third parties located all over the world. The bulk of these claims are subject to London arbitration clauses, but the location of such anticipated litigation is purely the consequence of the standard form of dispute resolution clauses in the charter parties and other agreements at issue. In practice, these disputes will be resolved (by negotiation) and/or prosecuted by the Joint Liquidators at my direction from the BVI.

71.     Furthermore, it is clear to me that prior to Liquidation, TERC consistently represented itself to its counterparties as being a BVI company.

72.     In charter parties where TERC acted as disponent owner of its vessels, TERC was usually described as "Transfield ER Cape Limited, BVI." *See* Time Charter for the M/V

---

[4] A significant amount of TERC's books and records are in the BVI. The Joint Liquidators are presently marshalling other known books and records and attempting to ensure that any records in the custody of third parties or outside the BVI are transferred to the BVI.

MARIA A ANGELICOUSSI (TERC as owner), relevant excerpts of which are attached hereto as Exhibit 10.

73.     In charter parties where TERC acted as charterer or subcharterer, TERC was usually described as "Transfield ER Cape Limited, Charterers of the City of BVI." *See, e.g.,* Time Charter for the M/V M/V MARIA A ANGELICOUSSI (TERC as charterer); Time Charter for the M/V IRON MINER, relevant excerpts of which are attached hereto as Exhibit 11; Addendum No. 1 to Time Charter for the M/V IRON MINER [p 403] (referring to TERC as "Transfield ER Cape Limited, B.V.I.") attached hereto as Exhibit 12; Time Charter for the M/V BOCIMAR, relevant excerpts of which are attached hereto as Exhibit 13.

74.     In contracts of affreightment and riders thereto, TERC was usually described as "Transfield ER Cape Limited BVI." *See* Brazil-China Contract of Affreightment with BHP Billiton Marketing AG, dated May 22, 2008, attached hereto as Exhibit 14; Brazil-China Contract of Affreightment with Billiton Marketing AG, dated May 27, 2008, attached hereto as Exhibit 15.

75.     Similarly,     TERC's     insurance     documentation     with     its     insurer, Assuranceforeningent SKULD (Gjensidig), an excerpt of which is attached hereto as Exhibit 16, describes TERC as "Transfield ER Cape Ltd., BVI."

76.     Having reviewed TERC's books and records, I am confident that the documents mentioned above are entirely typical of TERC's agreements with third parties. Contracts of this type were at the heart of TERC's business, and it is my view that the way in which TERC described itself and allowed itself to be described in such contracts would have been the main source of information available to any third party seeking to ascertain TERC's whereabouts.

77. Furthermore, based upon my involvement in this matter, it is clear to me that TERC's creditors considered and continue to consider TERC to be based in the BVI.

78. TERC creditors SK Shipping Europe plc and SK Shipping Co. Ltd. served a statutory demand, attached hereto as Exhibit 17, upon TERC pursuant to the BVI 2003 Insolvency Act upon: "Transfield ER Cape Limited (the "Company") c/o Portcullis Trustnet Chambers, Ellen Skelton Building, P.O. Box 3444, Road Town, Tortola, British Virgin Islands."

79. TMT, the creditor whose petition ultimately resulted in the Liquidation Order similarly sought to obtain payment from TERC by making a winding-up petition in the BVI.

80. From the BVI, I have engaged in substantial negotiations with counsel for TERC creditor Jade, regarding the continuation of a profitable charter.

81. Finally, at TERC's request, a number of TERC's substantial creditors (China Earth Shipping Inc., China Sun Shipping Inc., China Saturn Inc., and Cosco Bulk Carrier Co Ltd) wrote letters of support in favor of the Liquidators and the BVI Liquidation proceedings. True and correct copies of these letters are attached hereto as Exhibit 18.

82. TERC had no employees in any jurisdiction. TERC's officers and directors did not reside in the BVI, but neither their identity nor locations have ever been publicly available as far as I am aware. As stated above, under BVI law, upon liquidation, liquidators displace officers and directors with respect to their duties. I reside in, and execute my powers and duties from, the BVI.

83. TERC maintained an agency relationship with an entity called Transfield Resources, which is based in Hong Kong. It is my understanding that the fact of the agency was usually disclosed to third parties. *See, e.g.,* Hire Statements from "Transfield ER Cape Limited, c/o Transfield Resources Ltd., as agent," attached hereto as Exhibit 19.

84.     I therefore believe that TERC's COMI is the BVI; that the BVI is the natural forum for a liquidation of TERC to occur; that TERC's creditors will be served protected if the BVI Liquidation is recognized as a foreign main proceeding; and that TERC is engaged in non-transitory economic activity in the BVI.

85.     In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except for the Ancillary Singapore Proceeding and the United Kingdom Recognition Proceeding, in which TERC is the subject of the proceeding.

86.     In accordance with Bankruptcy Rule 1007-1, attached hereto as Exhibit 20 is a list of known and pending actions in the United States in which TERC is named as a party, a list of known parties against which provisional relief is sought, and the disclosures required under Bankruptcy Rule 7007.1.

### The Need For Provisional Relief

87.     A temporary stay of all United States litigation pending this Court's decision on this application for recognition of the BVI Liquidation is necessary to preserve the estate and protect TERC's creditors.

88.     The key principle underlying the 2003 Act and BVI insolvency proceedings is *in pari passu* - that like creditors should be treated alike.

89.     Section 175 of the 2003 Act is entitled "Effect of Liquidation." Section 175(c) states that "unless the Court otherwise orders, no person may (i) commence or proceed with any action or proceeding against the company or in relation to its assets, or (ii) exercise or enforce, or continue to exercise or enforce any right or remedy over or against the assets of the company."

90.     Section 176 of the 2003 Act is entitled "restriction on execution or attachment." Section 176(1) states that "Subject to subsections (2) and (3), a creditor is not entitled to retain the benefit of any execution process, distress or attachment over or against the assets of a company in liquidation unless the execution, process or attachment is completed before... the commencement of the liquidation..."

91.     Presently, no creditor involved in any of the United States proceedings has any priority to proceeds of the TERC estate under BVI law. Each has appeared or submitted claims in the BVI Liquidation and should be bound by the BVI stay as described above.

92.     If any creditor is permitted to execute upon the Escrow Funds, it will jeopardize and destroy the equitable distribution of assets in the BVI Liquidation. Additionally, I believe that the prospect of obtaining an improper priority to TERC funds in the United States will make a final resolution amongst the creditors more difficult and costly to achieve.

93.     I am advised that with respect to the Constellation, China Sun and China Earth actions, it is possible that a judgment could be entered against TERC before this Court has the opportunity to decide this petition for recognition.

94.     Counsel for the China Earth and China Sun entities has stated on the record that he intends to utilize the recent opinion of the New York Court of Appeals in *Koehler v. Bank of Bermuda Ltd.,* 12 N.Y.3d 533, 539 (2009) to enforce their judgments against the extra-territorial (non-New York) assets of TERC. Attached hereto as Exhibit 21 are relevant excerpts from their reply briefs.

95.     I am advised counsel for China Sun and China Earth would seek to accomplish this task by sending "restraining notices" and "information subpoenas" to banks and then

bringing "turnover actions" against those banks to demand that they turnover TERC assets (for example, in the BVI).

96.     It is without question that if Liquidation assets are frozen, restrained, or executed upon by one creditor in the U.S., then creditors as a whole will suffer. Similarly, it will be disastrous if the Joint Liquidators are unable to utilize the funds presently at its disposal to administer creditor claims and recover TERC's claims against third parties as a consequence of a "restraining notice."

97.     Similarly, TERC (in liquidation) (a) has claims against, (b) is continuing profitable charters with, (c) is obtaining insurance from, and (d) will be owed receivables by, numerous entities that are subject to New York jurisdiction. I am informed that a creditor in possession of a valid and final New York judgment could substantially disrupt these essential liquidation activities and further harm creditors as a whole.

98.     Finally, Jade, one of the Rule B attachment creditors, has already demanded discovery in support of its contention that its Rule B attachment is valid. I understand that Jade's motion for discovery could be decided in the near future - perhaps even before a decision on recognition is made by this Court. Such discovery will constitute a significant waste of limited estate resources in the event that recognition is granted.

99.     Attached hereto as Exhibit 22 is a true and correct copy of a signed resolution authorizing me to apply to this Court for the relief sought on behalf of the Joint Liquidators.

For all of these reasons, I respectfully request that this Court enter an Order recognizing Petitioner as a foreign representative and the BVI Liquidation as a foreign main proceeding under chapter 15, and enter an Order granting provisional relief pending the hearing on recognition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Road Town, British Virgin Islands

Dated: November 19, 2010

_____
Casey McDonald