# Exhibit 1

The Insolvency Act 2003

The Insolvency Rules 2005

ORIGINATING APPLICATION

(COMPANY)



FORM R14A

FEE STAMPS ON ORIGINAL
$ 1.204

Rule 14

| The Eastern Caribbean Supreme Court | |
| In the High Court of Justice | |
| Matter No. | BVIHCV 2010/ 12.1 |
| Applicant: | TMT BULK CORPORATION t/a TMT BULK CO. LTD. |
| Respondent: | TRANSFIELD ER CAPE LIMITED |

IN THE MATTER OF:

| TRANSFIELD ER CAPE LIMITED |
| ORDER |

BEFORE:     The Honourable Mr. Justice Edward Bannister, Q.C.

DATED:      30 September      , 2010

ENTERED:    4ᵗʰ October , 2010

UPON THE ORIGINATING APPLICATION filed by the Applicant on 3 September, 2010

AND UPON HEARING Tana'ania Small Davis for the Applicant and Oliver Clifton for the Respondent

AND UPON READING the Affidavits and documentary exhibits filed herein

IT IS HEREBY ORDERED THAT:

1) The Respondent's application for the appointment of joint provisional liquidators be dismissed.

2) Transfield ER Cape Limited (the Company) be wound up by the Court in accordance with the provisions of the Insolvency Act 2003.

3) Casey McDonald, of KPMG (BVI) Limited, P.O. Box 4467, Road Town, Tortola, British Virgin Islands, Bob Yap Cheng Ghee, of KPMG Advisory Services Pte Ltd 16 Raffles Quay, #22-00 Hong Leong Building, Singapore 048581 and Patrick Cowley, of KPMG, 27th Floor, Alexandra House, 18 Chater Road, Central, Hong Kong be appointed jointly and severally as liquidators (the Liquidators) of the Company until further order.

4) The Liquidators shall have all the powers necessary to carry out the functions and duties of a liquidator under the BVI Insolvency Act, 2003 (the "Act"), including the following:

    a) Power to pay any class of creditors in full.

    b) Power to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the company, whether present or future, certain or contingent, ascertained or not.

    c) Power to compromise, on such terms as may be agreed

        (ii) calls and liabilities to calls, debts and liabilities capable of resulting in debts, and claims, whether present or future, certain or contingent, ascertained or not, subsisting or supposed to subsist between the company and any person; and

        (iii) questions in any way relating to or affecting the assets or the liquidation of the company;

    and take security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect of it.

    d) Power to commence, continue, discontinue or defend any action or other legal proceedings in the name and on behalf of the company in the British Virgin Islands and elsewhere.

    e) Power to carry on the business of the company so far as may be necessary for its beneficial liquidation.

    f) Power to sell or otherwise dispose of property of the company.

    g) Power to do all acts and execute, in the name and on behalf of the company, any deeds, receipts or other document.

    h) Power to use the company's seal.

    i) Power to prove, rank and claim in the bankruptcy, liquidation, insolvency or sequestration of any member or past member for any balance against his

000042

estate, and to receive dividends, in the bankruptcy, liquidation, insolvency, sequestration or in respect of that balance, as a separate debt due from the bankrupt or insolvent, and rateably with the other separate creditors.

j) Power to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the company with the same effect with respect to the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business.

k) Power to borrow money, whether on the security of the assets of the company or otherwise.

l) Power to take out in his official name letters of administration to any deceased member or past member or debtor, and to do any other act necessary for obtaining payment of any money due from a member or past member or debtor, or his estate, that cannot conveniently be done in the name of the company.

m) For the purpose of enabling the Liquidators to take out letters of administration or do any other act under this paragraph, to be due to the Liquidators themselves.

n) Power to call meetings of creditors or members for

(i) the purpose of informing creditors or members concerning the progress of matters arising in the liquidation;

(ii) the purpose of ascertaining the views of creditors or members on any matter arising in the liquidation; or

(iii) such other purpose connected with the liquidation as the Liquidators consider fit.

o) Power to appoint a solicitor, accountant or other professionally qualified person to assist him in the performance of his duties.

p) Power to appoint an agent to do any business that the Liquidators are unable to do themselves, or which can be more conveniently done by an agent.

q) Power to apply to the Court for directions concerning any matter arising out of the exercise of the above powers.

r) Power to do all other things incidental to the exercise of the above functions and powers

5) The powers of the Liquidators listed at paragraphs 4(a) to 4(e) shall only be exercisable with the sanction of the Court.

6) The costs of the liquidation including the proper fees and disbursements of the Liquidators are to be paid out of the assets of the Company, in priority to all other claims.

3

000043

7) The Applicant is to be paid the costs of this Application, out of the assets of the Company in priority to the unsecured creditors of the Company.

**By the Court**

**Registrar**

4

000044

| | The Eastern Caribbean Supreme Court In the High Court of Justice |
|---|---|
| Matter No. | BVIHCV (COM2010/121 |
| Applicant: | TMT BULK CORPORATION t/a TMT BULK CO. LTD |
| Respondent: | TRANSFIELD ER CAPE LIMITED |
| | ORDER |

Farara Kerins
Legal Solicitors for the Applicant

000045

# Exhibit 2



# British Virgin Islands

## The International Business Companies Act

## (CAP. 291)

*Memorandum of Association*
*and*
*Articles of Association*
*of*

**Transfield ER Cape Limited**

Incorporated the 22nd day of May 2003.



TrustNet (British Virgin Islands) Limited
TrustNet Chambers, P.O. Box 3444
Road Town, Tortola, British Virgin Islands
Telephone: (284) 494 5296
Fax: (284) 494 5283



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT

(CAP. 291)

MEMORANDUM OF ASSOCIATION
OF

Transfield ER Cape Limited

**NAME**

1. The name of the Company is Transfield ER Cape Limited

**REGISTERED OFFICE**

2. The Registered Office of the Company is the offices of TrustNet (British Virgin Islands) Limited, TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands.

**REGISTERED AGENT**

3. The Registered Agent of the Company is TrustNet (British Virgin Islands) Limited of TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands,

**GENERAL OBJECTS AND POWERS**

4. (1) The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands;

   (2) The Company may not

   (a) carry on business with persons resident in the British Virgin Islands;

   (b) own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

   (c) carry on banking or trust business, unless it is licensed to do so under the Banks and Trust Companies Act, 1990;

   (d) carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

   (e) carry on business of company management, unless it is licensed under the Company Management Act, 1990; or

   (f) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

1

000002

(3)    For the purposes of paragraph 4.2 (a), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if

     (a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

     (b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

     (c)    it prepares or maintains books and records within the British Virgin Islands;

     (d)    it holds, within the British Virgin Islands, meetings of its directors or members;

     (e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

     (f)    it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act; or

     (g)    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act.

(4)    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands, irrespective of corporate benefit, to perform all acts and engage in all activities necessary or conducive to the conduct, promotion or attainment of the object of the Company.

## CURRENCY

5.    Shares in the Company shall be issued in the currency of the United States of America.

## AUTHORIZED CAPITAL

6.    The authorized capital of the Company is US$50,000.00

## CLASSES, NUMBER AND PAR VALUE OF SHARES

7.    The authorized capital is made up of one class and one series of shares divided into 50,000 shares of US$1.00 par value.

## DESIGNATIONS, POWERS PREFERENCES, ETC. OF SHARES

8.    All shares shall
     (a)    have one vote each;
     (b)    be subject to redemption, purchase or acquisition by the Company for fair value; and
     (c)    have the same rights with regards to dividends and distributions upon liquidation of the Company.

2

000003

## VARIATION OF CLASS RIGHTS

9. If at any time the authorized capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less that three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

## RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU

10. The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

## REGISTERED SHARES AND PROHIBITION ON ISSUE OF BEARER SHARES

11. Shares in the Company may only be issued as registered shares. The issue of shares to bearer is prohibited.

## PROHIBITION ON EXCHANGE OF REGISTERED SHARES TO BEARER SHARES

12. The exchange of registered shares to bearer shares is prohibited.

## TRANSFER OF REGISTERED SHARES

13. Subject to the provisions of the Articles of Association annexed hereto (the "Articles of Association") registered shares in the Company may be transferred subject to the prior or subsequent approval of the Company as evidenced by a resolution of directors or by a resolution of members.

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

14. The Company may amend its Memorandum of Association and Articles of Association by a resolution of members or by a resolution of directors.



3

**DEFINITIONS**

13. The meanings of words in this Memorandum of Association are as defined in the Articles of Association.

We, TrustNet (British Virgin Islands) Limited of TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 22nd day of May 2003.

In the presence of:

Witness



TrustNet Chambers .
P.O. Box 3444
Road Town, Tortola

Sgd. Melinda McGlore

Subscriber

TrustNet (British Virgin Islands) Limited

Sgd. Nicole Wheatley

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT

(CAP. 291)

ARTICLES OF ASSOCIATION
OF

Transfield ER Cape Limited

## PRELIMINARY

1.  In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| Words | Meaning |
|---|---|
| capital | The sum of the aggregate par value of all outstanding shares with par value of the Company and shares with par value held by the Company as treasury shares plus |
| | (a) the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
| | (b) the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| member | A person who holds shares in the Company. |
| person | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons. |
| resolution of directors | (a) A resolution approved at a duly convened and constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a simple majority of the directors present at the meeting who voted and did not abstain; or |
| | (b) a resolution consented to in writing by all directors or of all members of the committee, as the case may be; |

1

000005

except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority.

**resolution of members**

(a) A resolution approved at a duly convened and constituted meeting of the members of the Company by the affirmative vote of

    (i) a simple majority of the votes of the shares entitled to vote thereon which were present at the meeting and were voted and not abstained, or

    (ii) a simple majority of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority of the votes of the remaining shares entitled to vote thereon which were present at the meeting and were voted and not abstained; or

(b) a resolution consented to in writing by

    (i) an absolute majority of the votes of shares entitled to vote thereon, or

    (ii) an absolute majority of the votes of each class or series of shares entitled to vote thereon as a class or series and an absolute majority of the votes of the remaining shares entitled to vote thereon;

**securities**

Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations.

**surplus**

The excess, if any, at the time of the determination of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital.

**the Act**

The International Business Companies Act (CAP. 291) including any modification, extension, re-enactment or renewal thereof and any regulations made thereunder.

**the Memorandum**

The Memorandum of Association of the Company as originally framed or as from time to time amended.

**the Seal**

Any Seal which has been duly adopted as the Seal of the Company.

2

| these Articles | These Articles of Association as originally framed or as from time to time amended. |
|---|---|
| treasury shares | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

2.  "Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of reproducing words in a visible form, including telex, facsimile, telegram, cable or other form of writing produced by electronic communication.

3.  Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

4.  Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

5.  A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

6.  A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which shares in the Company shall be issued according to the provisions of the Memorandum.

## REGISTERED SHARES

7.  Every member holding registered shares in the Company shall be entitled to a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signature of the director or officer and the Seal may be facsimiles.

8.  Any member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a share certificate for registered shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

9.  If several persons are registered as joint holders of any shares, any one of such persons may give an effectual receipt for any dividend payable in respect of such shares.

## SHARES, AUTHORIZED CAPITAL, CAPITAL AND SURPLUS

10.  Subject to the provisions of these Articles and any resolution of members, the unissued shares of the Company shall be at the disposal of the directors who may, without limiting or affecting any rights previously conferred on the holders of any existing share or class or series of shares, offer, allot, grant options over or otherwise dispose of shares to such persons, at such times and upon such terms and conditions as the Company may by resolution of directors determine.

3

090008

11. No share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the share is for all purposes fully paid and non- assessable save that a share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in these Articles.

12. Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the foregoing as shall be determined by a resolution of directors.

13. Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved. The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus.

14. A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

15. Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company may by resolution of directors determine.

16. The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

17. Upon the issue by the Company of a share without par value, if an amount is stated in the Memorandum to be authorized capital represented by such shares then each share shall be issued for no less than the appropriate proportion of such amount which shall constitute capital, otherwise the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the share is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

18. The Company may purchase, redeem or otherwise acquire and hold its own shares but only out of surplus or in exchange for newly issued shares of equal value.

19. Subject to provisions to the contrary in

   (a) the Memorandum or these Articles;

   (b) the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued; or

   (c) the subscription agreement for the issue of the shares,

   the Company may not purchase, redeem or otherwise acquire its own shares without the consent of members whose shares are to be purchased, redeemed or otherwise acquired.

4

20. No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of accounts, and its capital and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

21. A determination by the directors under the preceding Article is not required where shares are purchased, redeemed or otherwise acquired

   (a) pursuant to a right of a member to have his shares redeemed or to have his shares exchanged for money or other property of the Company;

   (b) by virtue of a transfer of capital pursuant to these Articles;

   (c) by virtue of the provisions of Section 83 of the Act; or

   (d) pursuant to an order of the Court.

22. Shares that the Company purchases, redeems or otherwise acquires pursuant to the preceding Article may be cancelled or held as treasury shares except to the extent that such shares are in excess of 80 percent of the issued shares of the Company in which case they shall be cancelled but they shall be available for reissue.

23. Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

24. The Company may purchase, redeem or otherwise acquire its shares at a price lower than the fair value if permitted by, and then only in accordance with, the terms of

   (a) the Memorandum or these Articles; or

   (b) a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired.

25. The Company may by a resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

## MORTGAGES AND CHARGES OF REGISTERED SHARES

26. Members may mortgage or charge their registered shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements herein contained for consent to the transfer of shares.

27. In the case of the mortgage or charge of registered shares there may be entered in the share register of the Company at the request of the registered holder of such shares

5

(a) a statement that the shares are mortgaged or charged;

(b) the name of the mortgagee or chargee; and

(c) the date on which the aforesaid particulars are entered in the share register.

28. Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

(a) with the consent of the named mortgagee or chargee or anyone authorized to act on his behalf; or

(b) upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

29. Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf.

## FORFEITURE

30. When shares issued for a promissory note or other written obligation for payment of a debt have been issued subject to forfeiture, the following provisions shall apply.

31. Written notice specifying a date for payment to be made and the shares in respect of which payment is to be made shall be served on the member who defaults in making payment pursuant to a promissory note or other written obligations to pay a debt.

32. The written notice specifying a date for payment shall

(a) name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which payment required by the notice is to be made; and

(b) contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

33. Where a written notice has been issued and the requirements have not been complied with within the prescribed time, the directors may at any time before tender of payment forfeit and cancel the shares to which the notice relates.

34. The Company is under no obligation to refund any moneys to the member whose shares have been forfeited and cancelled pursuant to these provisions. Upon forfeiture and cancellation of the shares the member is discharged from any further obligation to the Company with respect to the shares forfeited and cancelled.

## LIEN

35. The Company shall have a first and paramount lien on every share issued for a promissory note or for any other binding obligation to contribute money or property or any combination thereof to the Company, and the Company shall also have a first and paramount lien on every share standing registered in the name of a member, whether singly or jointly with any other person or persons, for all the debts and liabilities of such member or his estate to the Company, whether the same shall have been incurred before or after notice to the Company of any interest of any person other than such member, and whether the time for the payment or

090011

discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such member or his estate and any other person, whether a member of the Company or not. The Company's lien on a share shall extend to all dividends payable thereon. The directors may at any time either generally, or in any particular case, waive any lien that has arisen or declare any share to be wholly or in part exempt from the provisions of this Article.

36. In the absence of express provisions regarding sale in the promissory note or other binding obligation to contribute money or property, the Company may sell, in such manner as the directors may by resolution of directors determine, any share on which the Company has a lien, but no sale shall be made unless some sum is in respect of which the lien exists is presently payable nor until the expiration of twenty-one days after a notice in writing, stating and demanding payment of the sum presently payable and giving notice of the intention to sell in default of such payment, has been served on the holder for the time being of the share.

37. The net proceeds of the sale by the Company of any shares on which it has a lien shall be applied in or towards payment of discharge of the promissory note or other binding obligation to contribute money or property or any combination thereof in respect of which the lien exists so far as the same is presently payable and any residue shall (subject to a like lien for debts or liabilities not presently payable as existed upon the share prior to the sale) be paid to the holder of the share immediately before such sale. For giving effect to any such sale the directors may authorize some person to transfer the share sold to the purchaser thereof. The purchaser shall be registered as the holder of the share and he shall not be bound to see to the application of the purchase money, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the sale.


## TRANSFER OF SHARES

38. Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

39. The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

40. Subject to any limitations in the Memorandum, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.


## TRANSMISSION OF SHARES

41. The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following three Articles.

42. The production to the Company of any document which is evidence of probate of the will, or letters of administration of the estate, or confirmation as executor, of a deceased member or of the appointment of a guardian of an incompetent member or the trustee of a bankrupt member shall be accepted by the Company

7

000912

even if the deceased, Incompetent or bankrupt member is domiciled outside the British Virgin Islands if the document evidencing the grant of probate or letters of administration, confirmation as executor, appointment as guardian or trustee in bankruptcy is issued by a foreign court which had competent jurisdiction in the matter. For the purpose of establishing whether or not a foreign court had competent jurisdiction in such a matter the directors may obtain appropriate legal advice. The directors may also require an indemnity to be given by the executor, administrator, guardian or trustee in bankruptcy.

43. Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

44. Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

45. What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## REDUCTION OR INCREASE IN AUTHORIZED CAPITAL OR CAPITAL

46. The Company may by a resolution of directors amend the Memorandum to increase or reduce its authorized capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any such shares or effect any combination of the foregoing.

47. The Company may amend the Memorandum to

   (a)   divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series; or

   (b)   combine the shares, including issued shares, of a class or series into a smaller number of shares of the same class or series,

provided, however, that where shares are divided or combined under (a) or (b) of this Article, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

48. The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital.

49. Subject to the provisions of the two next succeeding Articles, the capital of the Company may by resolution of directors be reduced by transferring an amount of the capital of the Company to surplus.

50. No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

8

090013

51. No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

## MEETINGS AND CONSENTS OF MEMBERS

52. The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

53. Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members.

54. The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting.

55. The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at the meeting.

56. A meeting of members may be called on short notice:

   (a) if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to short notice of the meeting, or

   (b) if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

57. The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

58. A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

59. The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

60. An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.
    (Name of Company)

    I/We                    being a member of the above
    Company with            shares HEREBY APPOINT
    of                      or failing him
    of                      to be my/our proxy to vote for me/us at the meeting of members to be held on the
    day of                  and at any adjournment thereof.

5

000014

(Any restrictions on voting to be inserted here.)

Signed this                     day of


------------------------------

Member

61.   The following shall apply in respect of joint ownership of shares:

(a)   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

(b)   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and

(c)   if two or more of the joint owners are present in person or by proxy they must vote as one.

62.   A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

63.   A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

64.   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

65.   At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose some one of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

66.   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

67.   At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the

10

outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

68. Any person other than an individual shall be regarded as one member and subject to the specific provisions hereinafter contained for the appointment of representatives of such persons the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

69. Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorize such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorized shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company.

70. The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

71. Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

72. An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more members.

## DIRECTORS

73. The first directors of the Company shall be appointed by the subscribers to the Memorandum, and thereafter, the directors shall be elected by the members for such term as the members determine.

74. The minimum number of directors shall be one and the maximum number shall be 20.

75. Each director shall hold office for the term, if any, fixed by resolution of members or until his earlier death, resignation or removal.

76. A director may be removed from office, with or without cause, by a resolution of members or, with cause, by a resolution of directors.

77. A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

78. The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the

11

090016

existing directors. A vacancy occurs through the death, resignation or removal of a director, but a vacancy or vacancies shall not be deemed to exist where one or more directors shall resign after having appointed his or their successor or successors.

79. The Company shall keep such registers of directors as required by the Act or as determined by resolution of the directors containing:

    (a)    the names and addresses of the persons who are directors of the Company;

    (b)    the date on which each person whose name is entered in the register was appointed as a director of the Company;

    (c)    the date on which each person named as a director ceased to be a director of the Company; and

    (d)    such other information as may be prescribed pursuant to the Act.

80. The original or a copy of any register of directors shall be kept at the registered office of the Company.

81. With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

82. A director shall not require a share qualification and may be an individual or a company.

## POWERS OF DIRECTORS

83. The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may be authorized by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made. Notwithstanding anything in Section 80 of the Act the directors shall have the power to sell, transfer, lease, exchange or otherwise dispose of more than fifty percent of the assets of the Company without submitting a proposal to or obtaining the consent of the members of the Company.

84. The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company. The resolution of directors appointing an agent may authorize the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

85. Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act.

86. Any director which is a body corporate may appoint any person its duly authorized representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

87. The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced to their knowledge below the number fixed by or pursuant to these Articles as the necessary quorum

22

for a meeting of directors, the continuing director or directors may act only for the purpose of appointing directors to fill any vacancy that has arisen or for summoning a meeting of members.

88. The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debentures stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

89. All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

90. The Company may determine by resolution of directors to maintain at its registered office a register of mortgages, charges and other encumbrances in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance:

    (a)  the sum secured;

    (b)  the assets secured;

    (c)  the name and address of the mortgagee, chargee or other encumbrancer;

    (d)  the date of creation of the mortgage, charge or other encumbrance; and

    (e)  the date on which the particulars specified above in respect of the mortgage, charge or other encumbrance are entered in the register.

91. The Company may further determine by a resolution of directors to register a copy of the register of mortgages, charges or other encumbrances with the Registrar of Companies.

## PROCEEDINGS OF DIRECTORS

92. The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

93. A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

94. A director shall be given not less than 3 days notice of meetings of directors, but a meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting and for this purpose, the presence of a director at a meeting shall constitute waiver on his part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

95. A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

96. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only 2 directors in which case the quorum shall be 2.

97. If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company

13

000018

and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

98. At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose some one of their number to be chairman of the meeting.

99. An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee as the case may be, without the need for any notice. The consent may be in the form of counterparts, each counterpart being signed by one or more directors.

100. The directors shall cause the following corporate records to be kept:

(a)    minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

(b)    copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

(c)    such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

101. The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the directors determine.

102. The directors may, by resolution of directors, designate one or more committees, each consisting of one or more directors.

103. Each committee of directors has such powers and authorities of the directors, including the power and authority to affix the Seal, as are set forth in the resolution of directors establishing the committee, except that no committee has any power or authority to amend the Memorandum or these Articles, to appoint directors or fix their emoluments, or to appoint officers or agents of the Company.

104. The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

OFFICERS

105. The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, a President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

106. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence

14

090019

of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

107. The emoluments of all officers shall be fixed by resolution of directors.

108. The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

## CONFLICT OF INTERESTS

109. No agreement or transaction between the Company and one or more of its directors or any person in which any director has a financial interest or to whom any director is related, including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors.

110. A director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

111. Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who

    (a)   is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

    (b)   is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

112. The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

113. The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

114. The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

15

090020

115. If a person to be indemnified has been successful in defence of any proceedings referred to above the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

116. The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## SEAL

117. The Company may have more than one Seal and references herein to the Seal shall be references to every Seal which shall have been duly adopted by resolution of directors. The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the Registered Office. Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of a director or any other person so authorised from time to time by resolution of directors. Such authorization may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings. The Directors may provide for a facsimile of the Seal and of the signature of any director or authorized person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS

118. The Company may by a resolution of directors declare and pay dividends in money, shares, or other property, but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorizing the dividends, a fair and proper value for the assets to be so distributed.

119. The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

120. The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set aside as a reserve fund upon such securities as they may select.

121. No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

122. Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

16

123. No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares or shares held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the vote in electing directors.

124. A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the issue of the share.

125. In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

126. In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

127. A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares.

### ACCOUNTS AND AUDIT

128. The Company may by resolution of members call for the directors to prepare periodically a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for the financial period and a true and fair view of the state of affairs of the Company as at the end of the financial period.

129. The Company may by resolution of members call for the accounts to be examined by auditors.

130. The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

131. The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

132. The remuneration of the auditors of the Company

    (a) in the case of auditors appointed by the directors, may be fixed by resolution of directors; and

    (b) subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

133. The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

    (a) in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period; and

    (b) all the information and explanations required by the auditors have been obtained.

134. The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

17

090022

135. Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

136. The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## NOTICES

137. Any notice, information or written statement to be given by the Company to members may be served in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register.

138. Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

139. Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered office or the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## PENSION AND SUPERANNUATION FUNDS

140. The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to, any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. Subject always to the proposal being approved by resolution of members, a director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension allowance or emolument.

## VOLUNTARY WINDING UP AND DISSOLUTION

141. The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.

## CONTINUATION

142. The Company may by resolution of members or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

16

000023

## ARBITRATION

143. Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to 2 arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

144. If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

We, TrustNet (British Virgin Islands) Limited of TrustNet Chambers, P.O. Box 3444, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association the 22nd day of May 2003.

In the presence of:

Witness                                              Subscriber

TrustNet Chambers
P.O. Box 3444
Road Town, Tortola

TrustNet (British Virgin Islands) Limited

Sgd. Melinda McGlore                    Sgd. Nicole Wheatley

19

000024




**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**
**(CAP. 291)**

CERTIFICATE OF INCORPORATION     (SECTIONS 14 AND 15)

No. 545849

The Registrar of Companies of the British Virgin Islands HEREBY CERTIFIES

pursuant to the International Business Companies Act, Cap. 291 that all

the requirements of the Act in respect of incorporation having been satisfied,

Transfield ER Cape Limited

is incorporated in the British Virgin Islands as an International Business

Company this 22nd day of May, 2003.

CERTIFIED TRUE COPY. Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands

Podouilis TrustNet (BVI) Limited
Registered Agent

REGISTRAR OF COMPANIES

CRTI001L



090025



# Exhibit 3

Transfield ER Cape Ltd.

Summary Estimated Assets & Liabilities as of September 17, 2010

USD

| Code | Liabilities | Notes | Claim & Debts | | Most Likely |
|------|-------------|-------|----------|-------------|-------------|
| | | | Estimated | Most Likely | Recovery $ |
| 100 | Confirmed Debt with Judgment | | 110,693,613.67 | 110,693,613.67 | 30,137,714 |
| 200 | Claims from Others | | 293,074,953.45 | 194,737,083.80 | 53,019,594 |
| 300 | Potential Claims from Others | 1 | 17,497,000.00 | 17,497,000.00 | 4,763,776 |
| 400 | Accounts Payables (Past Due) | | 8,903,040.94 | 8,903,040.94 | 2,423,964 |
| 500 | Broker Commission Payables & Claims | | 1,860,923.40 | 1,674,631.78 | 455,939 |
| | Total Claims & Debt | | 432,029,531.46 | 333,505,370.19 | 90,800,986 |

| | Assets | Notes | Our Claims & AR | | |
|------|--------|-------|----------|-------------|---|
| | | | Estimated | Most Likely | |
| 700 | AR (Past Due) | | 476,762.11 | 476,762.11 | |
| 800 | Our Claims to Others | 2 | 237,807,092.21 | 55,487,039.79 | |
| | Bank Balance | 3 | 4,882.59 | 4,882.59 | |
| | Money Held for TERC | | 344,255.77 | 344,255.77 | |
| | Blocked Deposits in US | 4 | 880,960.78 | 880,960.78 | |
| | Future Earnings ('C') | 5 | 33,607,085.31 | 33,607,085.31 | |
| | Total Receivables on Claims & AR | | 273,121,038.77 | 90,800,986.35 | |
| | Estimated Recovery Ratio | | 63% | 27% | |

Notes:

1. Potential Claims: Future commitment to (a) Shagang and (b) STX Pan Ocean and listed as zero amount for now
2. Our Claims to Others: Recovery of Armada's claim is assumed at 25%
3. Bank Balance: Deposits with DBS was frozen in Singapore
4. Blocked Deposits: Deposits was frozen in New York
5. Future Earnings: Include the following charter and receivables

| | |
|---|---|
| Mineral Hokkaido | 29,960,353 |
| Maria A Angelicoussi | 172,313 |
| Minmetal (Iron Miner) | 3,414,420 |
| Shourong (Shipment) | 60,000 |
| Total Future Earnings | 33,607,085 |

000026



Preliminary Report to the Creditors of

# Transfield ER Cape Limited
# (in Liquidation)

19 October 2010

AUDIT ▪ TAX ▪ ADVISORY

# Contents

The contacts at KPMG
in connection with this
report are:

**Casey McDonald**
*Director*
*Advisory, BVI*
*Tel: +1284 852 4801*
*Fax: + 1284 494 9009*
*ccmcdonald@kpmg.vg*

**Patrick Cowley**
*Principal*
*Restructuring Services, China*
*Tel: + 852 2140 2836*
*Fax: + 852 2869 7357*
*patrick.cowley@kpmg.com.hk*

**Bob Yap**
*Executive Director*
*Restructuring Services,*
*Singapore*
*Tel: + 65 6213 2677*
*Fax: + 65 6225 3083*
*byap@kpmg.com.sg*

| | Page |
|---|---|
| **Basis of preparation** | 2 |
| **Glossary of terms** | 3 |
| **Preliminary report to creditors** | |
| ● Background information and summary of financial position | 4 |
| ● Future earnings from continuing operations | 6 |
| ● Arbitrations and claims | 7 |
| ● Summary of tasks so far undertaken by the Liquidators | 8 |
| **Appendix 1 – Statutory and other information** | 10 |
| **Appendix 2 – Summary of Liquidators fee rates** | 11 |
| **Appendix 3 – Creditors information** | 12 |

© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated
with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.

# Basis of preparation

This Report has been prepared by the Joint Liquidators of Transfield ER Cape Limited (in Liquidation) solely for the purpose of providing the creditors with the available information regarding TERC's financial condition, to the extent that it is currently reasonably possible to do so.

This Report should not be relied upon by any other person, or for any other purpose, or used in any other context. This Report has been released to all reported creditors on a confidential basis and it should not be copied, referred to or disclosed, in whole or in part, without the prior written consent of the Joint Liquidators.

This Report has been prepared based on the results of the work carried out to date by the Joint Liquidators, on information obtained from the books and records of TERC, and on discussions with other relevant parties.

To the fullest extent permitted by law, the Joint Liquidators do not assume and will not accept any personal liability in respect of this Report to any other person. The Joint Liquidators act as agents of TERC without personal liability.

The appointments of the Joint Liquidators are personal to them and, to the fullest extent permitted by law, KPMG does not assume any responsibility and will not accept any liability to any person in respect of this Report and the conduct of their appointments.

If this Report is received by anyone other than the creditors, the recipient is placed on notice that the Report has been prepared solely for the creditors.





© 2010 KPMG. KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong

# Glossary of Terms

| | |
|---|---|
| **Armada** | Armada (Singapore) Pte Ltd (under Judicial Management) |
| **BVI** | British Virgin Islands |
| **COA** | Contract of Affreightment |
| **Liquidators** | Patrick Cowley, Casey McDonald and Bob Yap as Joint and Several Liquidators of Transfield ER Cape Limited (in Liquidation) |
| **Liquidation Order** | The Order of the High Court of the British Virgin Islands dated 30 September 2010 |
| **Transfield ER Cape Limited (in Liquidation)** | TERC or the Company |





© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong

# Background information and summary of financial position

At this stage, the Liquidators estimate of the return to creditors can only be presented in terms of a range, between TERC's projected 27% and the Liquidators' more conservative figure of 8%.

In its Statement of Assets and Liabilities as at 17 September 2010, TERC estimated that the creditor recovery could be as much as 27 per cent, before any liquidation costs and expenses.

However, the Liquidators have since revised this forecast to provide a preliminary estimate of 8 per cent return to creditors. These numbers remain subject to material fluctuation.

**Background**

- TERC carried on the business of chartering and sub-chartering bulk cargo ships.
- The winding-up proceedings were brought by way of an Originating Application dated 3 September 2010, filed by TMT Bulk Corporation t/a TMT Bulk Co. Ltd.
- On 30 September 2010, the High Court of the BVI has placed TERC into liquidation and appointed Patrick Cowley, Casey McDonald and Bob Yap as the Joint and Several Liquidators of TERC.

**Financial position**

- Below is a summary of TERC's Statement of Assets and Liabilities as of 17 September 2010. This should be read in conjunction with the notes provided on following page:

**TERC's Statement of Assets and Liabilities and estimated realisable value**

| | Note | Per TERC's record | Company's Estimated value | Liquidators' estimation and realised to date | Note |
|---|---|---|---|---|---|
| | | USD | USD | USD | |
| Assets | | | | | |
| Accounts Receivable | 1 | 476,762 | 476,762 | 308,791 | |
| Claims to Others | 2 | 62,521,884 | 11,665,738 | 11,665,738 | |
| Claims to Armada | 2 | 175,285,208 | 43,821,302 | 9,118,964 | 7 |
| Bank Balance | | 4,883 | 4,883 | 4,883 | |
| Money Held for TERC | | 344,256 | 344,256 | 708,428 | 8 |
| Blocked Deposits in the US | 3 | 880,961 | 880,961 | 880,961 | |
| Future Earnings | 4 | 33,607,085 | 33,607,085 | 11,712,918 | 9 |
| Total Assets | | 273,121,039 | 90,800,986 | 34,400,682 | |
| | | | | | |
| Liabilities | | | | | |
| Judgment Debts | | 110,693,614 | 110,693,614 | 110,693,614 | |
| Claims from Others | 5 | 293,074,953 | 194,737,084 | 293,074,953 | 10 |
| Potential Claims from Others | 6 | 17,497,000 | 17,497,000 | 17,497,000 | |
| Accounts Payables | | 8,903,041 | 8,903,041 | 8,903,041 | |
| Commission Payables | | 1,860,923 | 1,674,632 | 1,674,632 | |
| Total Liabilities | | 432,029,531 | 333,505,370 | 431,843,240 | |
| Asset/Liability Ratio | | 63% | | | |
| Liquidation Costs | | | | (1,000,000) | |
| Estimated Recovery Ratio | | | 27% | 8% | |

**The main 'swing' factors in the 27% - 8% range are the future earnings from TERC's operations and the Armada claim.**

**The above information remains subject to material adjustment as more information becomes available to the Liquidators.**



© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong

00000031

# Background information and summary of financial position

- All the financial information was provided by TERC's management. The Liquidators have so far conducted only a preliminary review of the financial position of TERC and note the following:

**Notes**

1. A sum of US$167,971 was subsequently received on 27 Sept 2010 which gives a balance of accounts receivable of US$308,791.

2. This figure is derived from arbitrations and claims against other parties due to breaches and disputes arising from the time charter contracts, of which the largest claim is against Armada, which represents 74 per cent of the total receivables. TERC has submitted a claim of USD175 million against Armada, and had assumed this claim will be admitted in full and the recovery rate would be 25 per cent. This rate of recovery is noted to take the most optimistic scenario detailed by the Armada Judicial Managers in October 2009, and may not be realistic.

3. The amount represents the funds frozen in transit though New York pursuant to the orders granted by the New York Court, which resulted from the arbitrations brought by two creditors.

4. The future earnings represent the future net cash flow generated from the existing time charter contracts and COA, based on the assumption that the remaining profitable charters will be performed in accordance with their contract terms for the minimum period set out in the contract.

5. This liability is derived from creditors' claims against TERC for breaches of, and disputes arising from, time charter contracts. The Liquidators have not yet commenced the process of reviewing these claims, or the Company's estimate of the actual admissible claim.

6. According to the available information, TERC has a contingent liability of USD17.5 million, which resulted from the disputes arising from the time charter contracts.

7. The Judicial Managers of Armada have advised on 6 October 2010 that they are prepared to admit a claim from TERC in the amount of USD73.3 million only. Based on the more conservative dividend ratio declared by the Judicial Managers of 12.4 per cent, TERC's total recovery from the claim assets would be reduced to USD20.8 million. The Liquidators have instructed their lawyers to review the merits of TERC's claims against Armada in order to inform our response to the Judicial Managers' position.

8. A sum of US$708,428 was remitted to the Liquidators' BVI bank account on 12 October 2010.

9. In a deliberately more conservative analysis of the likely return to creditors, the Liquidators have assumed that Time Charter B (see page 6) might be terminated as early as Q2 of 2011, in which case the total future earnings of TERC would then be reduced to USD11.7 million. However, in this scenario TERC would have a cause of action against the counter-party of Time Charter B, which at this stage is not reasonably quantifiable.

10. The admissible quantum of the claims filed against TERC has not been determined, and the Liquidators have therefore reverted to the face value of claims submitted. This number is expected to be adjudicated downwards through the formal proof of debt process.





© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.

# Future earnings from continuing operations

**Time charter contracts**

- TERC has four remaining time charter contracts which are currently performing and profitable.

- Each contract has a minimum and maximum term, the applicable term being a matter for election by the charterer in each case.

- TERC has estimated that the total net income generated from the time charter contracts will be approximately USD33,324,814, on the assumption that the charterer performs the contract for the minimum period provided for in each time charter contract.

- A summary of the existing time charter contracts is as follow:-

| | A (Time Charter) | B (Time Charter) | C (Time Charter) | Contract of Affreightment |
|---|---|---|---|---|
| **Period:** | Q3 2011 | Q2 2013 | Q1 2012 | Q4 2010 |
| **Net cash flow** | USD95,988 | USD8,141,346 - USD29,754,915 | USD3,415,684 | USD60,000 |

- The future earnings of these time charter contracts are based on the following major assumptions:

  1. TERC would be able to fulfil its obligations as detailed in the time charter contracts.

  2. The sub-charterers would honour their time charter contracts with TERC until the end of the minimum hire period as referred in the contracts.

  3. No insurable events occur, such as the loss of a vessel at sea.

  4. The net cash flow figures are before liquidation costs.

- As such, the above projection of future earnings may be subject to change and should not be relied upon by any person, and anyone placing reliance on the above projection does so at their own risk.



 © 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.

# Arbitrations and claims

**In TERC's Statement of Assets and Liabilities as at 17 September 2010, the directors had identified claim assets of USD237 million and claim liabilities of USD293 million.**

**After conducting case by case reviews of each claim, the Liquidators' broad objective is to deal with these claims and arbitrations in the most expeditious and cost effective manner.**

- As an international shipping company, TERC is involved in a number of arbitration proceedings in foreign jurisdictions.
- TERC is a party to a total of twelve arbitrations and / or claims against other shipping companies, totalling approximately USD 237.8 million.
- On the liability side, TERC is a party to a total of twenty-three arbitrations and / or claims totalling approximately USD293.1 million.
- The majority of the charter party contracts are governed by English law and provide for disputes to be resolved in the UK jurisdiction.
- However, in view of the early stage of the liquidation, it is too early to make sensible statement about the merits of each of these claims and arbitrations and the impact of these on the liquidation, particularly in relation to TERC's claims against other parties. On the liability side, we have taken the most conservative view at this stage, by recognising each claim at its face value notwithstanding TERC's assertions that some of these claims are materially over-stated and are expected to be adjudicated downwards in the proof of debt exercise.
- Given the Liquidators' objective is to deal with these matters in an expeditious and cost effective manner, we will shortly being a process of analysing the merits of each claim with a view to contacting each relevant party, and, where appropriate, entering into settlement negotiations with each party, which settlements will need to be sanctioned by the BVI Court.





© 2010 KPMG, KPMG-BVI Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.

# Summary of tasks so far undertaken by the Liquidators

| Issues | Background | Action taken/Next steps |
|---|---|---|
| Carry on business of TERC | • Pursuant to the Liquidation Order, the Liquidators have the power to carry on the business of TERC so far as is necessary for its beneficial liquidation, subject to first obtaining the sanction of the BVI Court.<br><br>• TERC's business of chartering and sub-chartering bulk cargo ships expects to derive a net income of approximately US$33 million, till June 2013. | • In order to maximize the potential return to TERC's creditors, the Liquidators have applied to the BVI Court to obtain sanction to carry on the remaining business.<br><br>• The BVI Court has sanctioned the Liquidators' application to carry on business, subject to the Liquidators' ability to agree commercial terms with relevant stakeholders.<br><br>• Bank account opened in BVI for collection of income and receivables.<br><br>• Funds recovered from TERC's shipping agent in Hong Kong.<br><br>• Negotiate and agree new terms with TERC's agent. |
| Insurance coverage | • The owner of the time charter is required to hold protection and indemnity insurance under each charter contract. | • The Liquidators are negotiating with the insurer for the continuation of the insurance contracts.<br><br>• The Liquidators have obtained the sanction of the BVI Court to agree with the insurer the terms of the ongoing insurance coverage, in order to protect the income stream from the existing charter contracts.<br><br>• The insurer has agreed in principle to continue the insurance, and relevant agreements are now being drafted. |
| Recognition of BVI High Court Order in other jurisdictions | • As an international shipping company, TERC has creditors based in various foreign jurisdictions.<br><br>• Arbitration proceedings have been commenced in the UK and the US against TERC by its creditors, as well as Judgments in other jurisdictions such as Hong Kong and Singapore. | • In order to obtain a stay of the various arbitration proceedings and executions against TERC's assets for the benefit of the liquidation, the Liquidators are taking steps to seek recognition of our appointment as liquidators in the UK and the US. |



© 2010 KPMG, KPMG (BVI) Limited, a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong

# Summary of tasks so far undertaken by the Liquidators

| Issue | Background | Action taken/Next steps |
|---|---|---|
| Singapore winding up proceedings | • A winding up petition has been presented by a creditor against TERC in the High Court of Singapore | • On 1st October 2010, the High Court of the Singapore has placed TERC into liquidation and appointed Oasis McDonald Patrick Cowley and Desmond Chiong as the liquidators<br>• The Liquidators will seek to realise any Singapore based assets, deal with any profits Singapore creditors claim and remit surplus assets to the BVI Liquidators |

© 2010 KPMG, a KPMG Hong Kong, a Hong Kong partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong



000036

# Appendix 1 - Statutory and other information

| | |
|---|---|
| **Court details for the Winding Up:** | The Eastern Caribbean Supreme Court of the British Virgin Islands, in The High Court of Justice – Matter No. BVIHCV 2010/121 |
| **Full name:** | Transfield ER Cape Limited |
| **Registered Address:** | Registered office: Trust Net (British Virgin Islands) Limited, Trust Net Chambers, 4th Floor, Ellen Skelton Buildings, PO Box 3444, Road Town, Tortola, British Virgin Islands<br>Mailing / Correspondence address: KPMG (BVI) Limited, P.O. Box 4467, Road Town, Tortola, British Virgin Islands |
| **Date of Originating Application:** | 3 September 2010 |
| **Date of BVI Winding-up Order:** | 30 September 2010 |
| **Date of Singapore Winding-up Order:** | 15 October 2010 |
| **Liquidators' Name and Address:** | Casey McDonald of KPMG (BVI) Limited, P.O. Box 4467, Road Town, Tortola, British Virgin Islands<br>Patrick Cowley of KPMG, 27th Floor, Alexandra House, 18 Chater Road, Central, Hong Kong<br>Bob Yap Cheng Ghee of KPMG Advisory Services Pte Ltd, 16 Raffles Quay #22-00 Hong Leong Building, Singapore |
| **Lawyers involved (insolvency)** | DLA Piper<br>Walkers |
| **Lawyers involved (Arbitrations and claims)** | Richards Butler<br>Skinitis Maritime Law<br>Winter Scott |

090037


© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong

# Appendix 2 – Summary of Liquidators' fee rates

**Liquidators' fees and expenses**

- Below is a summary of the Liquidators' hourly charge out rates in each of the main jurisdictions for this case. The Liquidators' fees and expenses are to be paid out of the assets of TERC, in priority to all claims.

| KPMG (BVI) | | KPMG (Hong Kong & Singapore) | |
|---|---|---|---|
| Grade | Charge Out Rate (USD) | Grade | Charge Out Rate (USD) |
| Partner | 750 | Partner | 750 |
| Principal/Director | 625 | | |
| Senior Manager | 475 | Senior Manager | 625 |
| Manager | 400 | Manager (Year 3) | 550 |
| Assistant Manager | 330 | Manager (Year 3) | 500 |
| Supervising Senior | 280 | Manager (Year 3) | 450 |
| Senior (Year 2) | 265 | Assistant Manager (Year 3) | 350 |
| Senior (Year 1) | 245 | Assistant Manager (Year 2) | 300 |
| Staff Accountant (Year 2) | 210 | Assistant Manager (Year 1) | 250 |
| Staff Accountant (Year 1) | 190 | | |
| Assistant Accountant | 160 | Analyst (Year 1) | 150 |
| Trainee Accountant | 130 | Analyst (Year 1) | 130 |

090038



© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.

# Appendix 3 – Creditors information

| Name of Creditor | Nature of Liability | Contact Detail Email / Fax No. |
|---|---|---|
| "MS Vogerunner" Gmbh & Co. KG | Potential Claims from Others<br>Accounts Payables | postfix@Vogemann.de |
| Arrow Asia Ship Brokers Ltd. | Commission Payables | capeops.asia@arrowship.com |
| Beijing Shouguang Huaxia Int'l Trade Co. Ltd. | Accounts Payables | liuhuiliuhui314@163.com<br>whj666@yahoo.com<br>cain7890@126.com |
| Benxi Iron & Steel Group International Economic and Trading Co. Ltd. | Accounts Payables | +86 414 316 8016 0002 |
| BHP Billiton Marketing AG | Judgment Debt<br>Claims from Others | capeops@bhpbiliton.com |
| Bocimar International N.V. | Claims from Others | bocimar.operations@cmb.be |
| Cape Ray Schiffahrts Gmbh & Co.KG | Claims from Others | chartering@hansehamburg.de |
| Cetragpa S.B.C. | Accounts Payables | business@cetragpa.fr |
| Chang Myung Shipping Co. Ltd. | Claims from Others | kenpark@cmship.co.kr |
| China Earth Shipping Inc. | Judgment Debt | alan.ong@earthshpg.com |
| China National Chartering Company Ltd. | Claims from Others | ops@sinochart.com.cn |
| China Saturn Shipping Inc. | Claims from Others | alan.ong@saturnshpg.com |
| China Shandong Iron & Steel Products Co. Ltd. | Accounts Payables | shipping@jigang.com.cn |
| China Sun Shipping Inc. | Judgment Debt | alan.ong@sunshpg.com |
| CITIC Australia Commodity Trading Pty. Ltd. | Accounts Payables | suhua@citic.com<br>wuxw@citic.com |
| Clarkson | Commission Payables | capeops@clarksons.com |
| Constellation Energy Commodities Group Inc. | Judgment Debt | robert.clarkson@constellation.com |
| Cosco Bulk Carrier Company Ltd. | Claims from Others | shifuguo@chinacoscobulk.com |
| Deiuiemar Compagnia di Navigazione SPA | Potential Claims from Others<br>Accounts Payables | postfix@deiulemar.it |
| Handan Iron & Steel Co., Ltd. | Accounts Payables | zhoudaiyun@126.com |
| Ifchor SA | Commission Payables | capes@ifchor.ch |
| ILDO Chartering Corporation | Commission Payables | capepmx@ildochtrg.co.kr |
| International Economic and Trading Corporation, Wugang Group | Claims from Others | +86 27 8656 9410 |
| Iron Miner Shipco LLC | Claims from Others | fleet6@maryvillegroup.com |

000039



## Appendix 3 – Creditors information

| Name of Creditor | Nature of Liability | Contact Detail Email / Fax No. |
|---|---|---|
| Jade Navigation S.A. | Claims from Others | vessels@alphatankers.com |
| Kingdom Shipping Ltd. | Accounts Payables | +852 25720362 |
| Lorentsen & Stemoco | Commission Payables | chartering@lsscape.com |
| Louis Dreyfus Commodities Suisse S.A. | Claims from Others | massimo.vuotto@ldcom.com |
| Mitsui O.S.K Lines Ltd. | Claims from Others | kenta.kuroda@mail.mol.co.jp |
| Nanjing Iron & Steel Group International Trade Co. Ltd. | Accounts Payables | +86 25 8481 6649 |
| Nomura Trading Co. Ltd. | Claims from Others | zhaozenghai@hotmail.com |
| North China Shipping Company Ltd., BHM | Accounts Payables | capeops@northchina.com.hk |
| Pacific Empire Shipping Limited | Claims from Others | capepmx.spot@shipnet.gr |
| Rizhao Steel Holding Group Co. Ltd. | Accounts Payables | +86 21 6236 0903 |
| Rizzo Bottiglieri De Carlini Armatori SPA | Potential Claims from Others | chartering@rbdarmatori.it |
| Rockcheck Steel Group Co., Ltd. | Accounts Payables | +86 22 2868 1999 |
| Rodskog Shipbrokers | Commission Payables | chart@rodskogshipbrokers.com |
| Samsun Logix Corporation | Claims from Others | kim sh@samsun.co.kr |
| San Steel Group Co. Ltd. | Accounts Payables | +86 592 516 0271 |
| Seawin Chartering Ltd. | Potential Claims from Others | ops@seawinshipping.com |
| Shagang Shipping Co. Ltd. | Claims from Others | operating@shashipping.com |
| SK Shipping Europe Plc & SK Shipping Co. Ltd. | Judgment Debt | ops@skshippingeurope.com |
| STX Pan Ocean Co. Ltd. Seoul | Accounts Payables | sclee@stxpanocean.com skahn@stxpanocean.com |
| Swissmarine Services S.A. | Claims from Others Potential Claims from Others | capeops@swissmarine.ch csc@stxpanocean@com |
| tangshan Guofeng Iron & Steel Co. Ltd. | Accounts Payables | wangjianhua0126@hotmail.com |
| Tangshan Iron & Steel Group I&E Co. | Accounts Payables | zhangaidang@yahoo.com.cn |
| The Sanko Steamship Co. Ltd. | Claims from Others | cpcsct@sankoline.co.jp |
| TMT Bulk Co. Ltd. | Claims from Others Accounts Payables | op@tmtship.com |





© 2010 KPMG, KPMG (BVI) Limited, is a limited liability company incorporated in the British Virgin Islands and a member of firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. All rights reserved. Printed in Hong Kong.



**Exhibit 4**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS



IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF TRANSFIELD ER CAPE LIMITED
IN THE MATTER OF AN APPLICATION BY CASEY MCDONALD, BOB YAP, AND PATRICK
COWLEY, JOINT LIQUIDATORS OF TRANSFIELD ER CAPE LIMITED

Claim No. BVI HC (COM) 2010/121

TRANSFIELD ER CAPE LIMITED (IN LIQUIDATION)

Applicant

---

## ORDER FOR DIRECTIONS

---

**BEFORE:** The Honourable Justice Bannister QC

**MADE:** 13 October 2010

**ENTERED:** 29 October 2010

**UPON THE APPLICATION** pursuant to section 186(5) of the Insolvency Act, 2003, Casey McDonald, Bob Yap, and Patrick Cowley, as Joint Liquidators of Transfield ER Cape Limited ("the Company")

**AND UPON HEARING** Oliver Clifton, for the Joint Liquidators

**AND UPON** reading the First Witness Statement of Casey McDonald and the Exhibit thereto filed in support of this application

**IT IS HEREBY ORDERED THAT:**

1.  The Joint Liquidators do have leave, until further order, to carry on the business of the Company and use the assets of the Company for that purpose, to the extent required to

    (a)  fulfil the Company's obligations under and take all necessary steps in relation to the following:

        (i)  a time charter dated 20 April 2007 in respect of the vessel known as Mineral Hokkaido with Bocimar International N.V. as Owner;

        (ii)  a time charter dated 7 August 2006 in respect of the vessel known as Maria A Angelicoussi with Jade Navigation S.A. as Owner;

        (iii)  a time charter in respect of the vessel known as Iron Miner dated 6 December 2006 with Iron Miner Shipco LLC as Owner; and

1

(b)     investigate, negotiate, and agree the terms upon which protection and indemnity insurance cover may be provided to the Company in respect of the Charter Contracts;

(c)     investigate, negotiate, and agree the terms upon which the Company's shipping agent, Transfield Resources Limited, or an alternative service provider, may continue to undertake the day-to-day operational management of the Charter Contracts, at the prevailing market rate.

2.     The Joint Liquidators do have leave to take all necessary steps in the name of and on behalf of the Company and on their own behalf to commence proceedings in the United Kingdom and the United States seeking recognition of their appointment.

3.     The transcript of this hearing be sealed.

4.     The costs of this application be costs in the liquidation of the Company.

**BY THE COURT**

REGISTRAR

2

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS

IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF TRANSFIELD ER CAPE LIMITED
IN THE MATTER OF AN APPLICATION BY CASEY MCDONALD, BOB YAP, AND PATRICK
COWLEY, JOINT LIQUIDATORS OF TRANSFIELD ER CAPE LIMITED

Claim No. BVI HC (COM) 2010/121

TRANSFIELD ER CAPE LIMITED (IN LIQUIDATION)

Applicant

---

ORDER FOR DIRECTIONS

---

**Walkers**
**Legal Practitioners for the Applicant**

171 Main Street
PO Box 92
Road Town
Tortola
British Virgin Islands

Tel: +1 (284) 494 2204
Fax: +1 (284) 494 6683
**REF: SJH/OC/RS/H05178**



**Exhibit 5**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**BEFORE MR JUSTICE WARREN**

**DATED MONDAY 1 NOVEMBER 2010**



**IN THE MATTER OF TRANSFIELD ER CAPE LIMITED**

**AND IN THE MATTER OF THE CROSS-BORDER INSOLVENCY**

**REGULATIONS 2006**

---

## ORDER

---

**UPON THE APPLICATION** of Transfield ER Cape Limited ("**the Company**") and Casey McDonald, Bob Yap Cheng Ghee and Patrick Cowley ("**the Foreign Representatives**") (together "**the Applicants**")

**AND UPON READING** the evidence

**AND UPON HEARING** Counsel for the Applicants

**IT IS ORDERED** that:

1. The winding up of the Company in the British Virgin Islands pursuant to the BVI Insolvency Act 2003 be and hereby is recognised as a foreign main proceeding in accordance with the UNCITRAL Model Law on cross-border insolvency as set out in Schedule 1 to the Cross-Border Insolvency Regulations 2006 (S.I. 2006 No 1030) ("**the Model Law**").

2.  Pursuant to Articles 20(6) and 21(1)(g) of the Model Law, the stay and suspension in Article 20(1) of the Model Law is modified as follows and additional relief is granted in the following terms:

    (1)  no step may be taken to enforce any security (as defined by Article 2(n)(i) of the Model Law) over the Company's property except with the consent of the Foreign Representatives or the permission of the Court;

    (2)  no step may be taken to repossess goods in the Company's possession under a hire-purchase agreement (as defined in paragraph 111(1) of Schedule B1 to the Insolvency Act 1986) except with the consent of the Foreign Representatives or the permission of the Court;

    (3)  no legal process (including legal proceedings, execution, distress and diligence) may be instituted or continued against the Company or its property except with the consent of the Foreign Representatives or the permission of the Court;

    (4)  an administrative receiver (as defined in paragraph 111(1) of Schedule B1 to the Insolvency Act 1986) of the Company may not be appointed; and

    (5)  no winding up petition may be presented except with the consent of the Foreign Representatives or the permission of the Court, and no order may be made for the winding up of the Company (save as identified by paragraph 42(4) of Schedule B1 to the Insolvency Act 1986, and paragraph 42(5) of Schedule B1 to the Insolvency Act 1986 shall apply in respect of the Company).

4.  For the avoidance of doubt, this Order applies only in Great Britain and does not have extra-territorial effect.

Dated this 1st day of November 2010

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**BEFORE MR JUSTICE WARREN**
**DATED MONDAY 1 NOVEMBER 2010**

**IN THE MATTER OF**
**TRANSFIELD ER CAPE LIMITED**
**AND IN THE MATTER OF THE CROSS-**
**BORDER INSOLVENCY REGULATIONS 2006**

---

**ORDER**

---

**DLA Piper UK LLP**
1 St Paul's Place
Sheffield S1 2JX
Ref: DPM/SED

Applicants' solicitors

# Exhibit 6

| | |
|---|---|
| Case No. | : CWU122/2010/N |
| Document No. | : ORC5268/2010 / T |
| Date Of Filing | : 19/10/2010 |
| Time Of Filing | : 15:33:35 |
| Doc Control No. | : 2595100/B |
| Date Of Order | : 15/10/2010 |
| Made By | : LOH SZE-ON QUENTIN |



Mr. Foo Chee Hock
Registrar
Supreme Court
Singapore

**IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

CWU122/2010/N

In the Matter of the Companies Act (Cap.50)

And

In the Matter of Transfield ER Cape Limited (BVI Company registration number 545849)

Between

C O N S T E L L A T I O N   E N E R G Y
C O M M O D I T I E S   G R O U P   I N C
(United States) RC No. 2716959

...Plaintiff(s)

And

TRANSFIELD ER CAPE LIMITED
(Virgin Islands, British) RC No. 545849

...Defendant(s)

---

**ORDER FOR WINDING UP (FINAL ORDER - COMPANIES WINDING UP)**

---

CHAN LENG SUN/
NG WEITING
ANG & PARTNERS
79 Robinson Road
#22-00
CPF Building
SINGAPORE 068897
TEL:62242530
FAX:62253680
Ref: CLS/NWT/as/H.2010-11586

Filed this 19th day of October 2010

000585

CWU O.S. No. 122 of 2010/N  )    In the Matter of the Companies Act (Cap. 50)

And

In the Matter of Transfield ER Cape Limited
(BVI Company registration number 545849)

Between

**CONSTELLATION ENERGY
COMMODITIES GROUP INC**
(Delaware Company registration number 2716959)
... Plaintiff

And

**TRANSFIELD ER CAPE LIMITED**
(BVI Company registration number 545849)
...Defendant

## ORDER OF COURT

<u>**BEFORE THE HONOURABLE
JUSTICE LOH SZE-ON QUENTIN**</u>          <u>**IN OPEN COURT**</u>

**UPON THE APPLICATION** of the abovenamed Plaintiff made by way of Companies Winding Up Originating Summons No. 122 of 2010/N coming on for hearing this day, **AND UPON READING** the affidavit of Matthew Allan Swartz sworn on 16 July 2010 and the exhibits referred to therein and the affidavit of Jianping Wu affirmed on 30 September 2010 and the exhibits referred to therein **AND UPON HEARING**

000586

Counsel for the Plaintiff and Counsel for the Defendant, BY CONSENT IT IS
ORDERED that:-

1. Transfield ER Cape Limited, the Defendant herein, be wound up by the Court
   under the provisions of the Companies Act (Cap. 50, 1994 ed), in particular
   section 351 thereof.

2. That (i) Mr Bob Yap Cheng Ghee (NRIC No. S1766713J), of KPMG Advisory
   Services Pte Ltd, 16 Raffles Quay #22-00 Hong Leong Building, Singapore
   045851, being an approved liquidator; and subject to the Minister's approval
   pursuant to section 9 of the Companies Act, (ii) Mr Casey McDonald (Passport
   No. BA441382) of KPMG (BVI) Limited, KPMG (BVI) Limited, P.O. Box 4467,
   Road Town, Tortola, British Virgin Islands, and (iii) Mr Patrick Cowley (Passport
   No. 761251118) of KPMG, 27th Floor, Alexandra House, 18 Charter Road,
   Central Hong. Kong, be appointed the joint and several Liquidators of the
   Defendant.

3. That the Liquidators be authorised to exercise all or any powers provided in
   Section 272(1) of the Companies Act.

4. That the costs of and incidental to the Application, to be agreed or taxed, be paid
   to the Plaintiff out of the assets of the Defendant as part of the costs and expenses
   of winding up.

5. That the Order made by the Honourable Justice Judith Prakash on 3 September 2010 restraining the Defendant from receiving the payment of the debt or any part thereof owing by Armada Singapore Pte Ltd to the Defendant be discharged.

Dated this 15th day of October 2010.

REGISTRAR

Note: It will be the duty of such of the persons as liable to make out or concur in making out a statement of affairs as the liquidator may require, to attend on him at such time and such place as he may appoint and to give him all information he may require.

099598

**Exhibit 7**

203-10/PJG/GMV/EJC
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JADE NAVIGATION S.A., | 10 Civ. _____ |
| Plaintiff, | **ORDER DIRECTING CLERK TO ISSUE PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT AND APPOINTING PROCESS SERVER** |
| - against - | |
| TRANSFIELD ER CAPE LIMITED, | |
| Defendant. | |

On June 23, 2010, Plaintiff Jade Navigation S.A. filed a Verified Complaint in the captioned action seeking, *inter alia*, damages and the issuance of Process of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (hereinafter "Rule B"), in an amount up to and including of **$866,377.36**.

The Court has reviewed the Verified Complaint and the Supporting Affidavit of Edward J. Carlson, dated June 23, 2010, and finds that the conditions of Rule B appear to exist, as the Affidavit of Edward J. Carlson has demonstrated that the defendant is not present within the District but that the defendant's property is located in this District, including without limitation, funds or assets of the defendant held in escrow at either JPMorgan Chase or with counsel in connection with the action filed by Front Carriers against the defendant bearing Civil Action No. 07 Civ. 6333 (RJS) (S.D.N.Y.).

**ACCORDING, IT IS HEREBY**

**ORDERED** that, pursuant to Rule B, Process of Maritime Attachment and Garnishment shall issue in an amount up to **$866,377.36** against all goods, chattel, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, or any other tangible or intangible property

belonging to, claimed by, being held for or on behalf of, or being transferred for the benefit of Defendant including without limitation any funds or assts being held in connection with Civil Action No. 07 Civ. 6333 (RJS) in the possession, custody or control of JPMorgan Chase, Holland & Knight, LLP, Chalos, O'Connor & Duffy, LLP, or Lennon Murphy Caulfield & Phillips, LLC, upon whom a copy of the Process of Maritime Attachment Garnishment may be served; and

**ORDERED** that any person claiming an interest in any property attached or garnished pursuant to this Order shall, upon application to the Court, be entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment and garnishment should not be vacated; and

**ORDERED** that any person at least 18 years of age and not a party to this action, employed with or appointed by Plaintiff's counsel, Freehill, Hogan & Mahar, LLP, be and hereby is appointed to serve this Order and Process of Maritime Attachment and Garnishment on the garnishees identified herein and on such additional garnishees as permitted herein; and

**ORDERED**, that supplemental process specifying other or additional garnishees and enforcing the Court's order may not be issued by the Clerk without further Order of the Court;

**ORDERED**, that a copy of this Order be attached to and served with initial service of the Process of Maritime Attachment and Garnishment upon each garnishee; and

**ORDERED,** that upon determining that it is in possession of any property which may be subject to this Order, any garnishee shall, as soon thereafter as is practicable, advise the plaintiff of such details about the attachment as are reasonably available to it.

U.S. DISTRICT JUDGE

6/25/10

10 "am.

# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TMT  BULK CO., LTD. d/b/a TMT BULK
CORPORATION OF PANAMA

Plaintiff,

- against -

TRANSFIELD ER CAPE LTD. and
TRANSFIELD ER LTD.

Defendants.
------------------------------------------------------------X

**10  CV  5110**

10 CV
ECF CASE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/6/10

## ORDER DIRECTING CLERK TO ISSUE PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT AND APPOINTING PROCESS SERVER

**WHEREAS,** on July 2, 2010 Plaintiff, TMT  BULK  CO LTD. d/b/a TMT  BULK CORPORATION OF PANAMA filed a Verified Complaint in the captioned action seeking damages of **USD$922,720.79** inclusive of interest, costs and reasonable attorneys' fees, and praying for issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure; and,

**WHEREAS,** the Court has reviewed the Verified Complaint and the Supporting Affidavit of Thomas L. Tisdale dated July 2, 2010 and finds that the conditions of Supplemental Admiralty Rule B appear to exist, and

**WHEREAS,** Plaintiff has moved for an Order pursuant to Fed.R.Civ.P.  4(c)(3) and Supplemental Admiralty Rule B(1)(d)(ii) appointing Tisdale Law Offices LLC or any other person appointed by Tisdale Law Offices LLC who is over 18 years of age and is not a party to this action,

1

to serve Process of Maritime Attachment and Garnishment in this matter, and it appearing that such appointment will result in substantial economies in time and expense, it is hereby

**ORDERED,** that Process of Maritime Attachment and Garnishment shall issue against all tangible or intangible property belonging to, claimed by or being held for Defendants by garnishee JP Morgan Chase Bank, upon whom a copy of the Process of Maritime Attachment and Garnishment may be served in an amount of up to **USD$922,720.79** pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure; and, it is further,

**ORDERED,** that any person claiming an interest in any property attached or garnished pursuant to this Order shall, upon application to the Court, be entitled to a prompt hearing at which the Plaintiff shall be required to show why the attachment and garnishment should not be vacated; and it is further,

**ORDERED,** that any person at least 18 years of age and not a party to this action employed with or appointed by Tisdale Law Offices LLC be and hereby is appointed to serve this Order and Process of Maritime Attachment and Garnishment on the garnishee identified herein and on such additional garnishees as so permitted herein; and it is further,

**ORDERED,** that supplemental process specifying other or additional garnishees and enforcing the Court's Order may be issued by the Clerk without further Order of the Court; and it is further,

**ORDERED,** that initial service by the United States Marshal or other designated process server shall be made personally upon the garnishee named herein, or any other garnishees later determined to hold assets or property of the Defendants, provided however that, pursuant to Federal

2

Rule of Civil Procedure 5(b)(2)(E) and/or (F), any garnishee may consent in writing to accept such initial service by other means, including facsimile, e-mail, or other verifiable electronic means. The consent of the garnishee may be manifested in the garnishee's rules, policies or other instructions regarding service.  Service shall be deemed made within the District if a natural person within the Circuit causes the service to be transmitted to a garnishee having an office within the District; and it is further,

**ORDERED,** that a copy of this Order be attached to and served with initial service of the Process of Maritime Attachment and Garnishment upon each garnishee; and it is further,

**ORDERED,** that following initial service as described above, supplemental service of the Process of Maritime Attachment and Garnishment may be made by way of facsimile transmission or e-mail to a fax number or e-mail address designated by the garnishee for that purpose or by other means consented to by the garnishee pursuant to Fed. R. Civ. P. 5(b)(2)(E) and/or (F).  Such consent may be manifested in the garnishee's rules, policies or other instructions regarding service; and it is further,

**ORDERED,** that service on any garnishee as described herein is deemed to be effective and continuous (i) throughout the remainder of the day of service from the time of such service and (ii) through the end of the next business day, provided another service is made during the next business day; and it is further,

**ORDERED,** that any garnishee served with this Order, upon determining that it is in possession of any property which may be subject to this Order, shall, as soon thereafter as is practicable, advise the Plaintiff of such details about the attachment as are reasonably available to it; and it is further,

3

**ORDERED**, that this Order shall automatically expire 120 days from the date of its issuance, except that the Order shall not expire in respect of any funds attached during that period. Moreover, this Order may be extended for up to an additional 90 days upon a showing of good cause by plaintiff, provided that where at least some funds have been attached within the first 120 days, such extension shall be freely given. Such application for an extension may be made by letter application. Further 90-day extensions may be granted in the discretion of the Court, but only upon a showing by plaintiff of extraordinary circumstances; and it is further,

**ORDERED**, that in the event property is attached pursuant to this Order, such attachment shall automatically expire 60 days thereafter unless plaintiff advises the Court by letter within that time of the particulars of such attachment and either confirms that it has commenced proceedings or arbitration on the merits of the claims underlying the attachment or shows good cause why it has not done so; and it is further,

**ORDERED**, that upon expiration or vacatur of this Order by reason of the two preceding paragraphs, this Action may be dismissed without prejudice, without costs, and without further notice to any party.

Dated: _____ 7/ 2 _____, 2010          **SO ORDERED:**

_____
U.S.D.J.

4



**Exhibit 9**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TMT BULK CO. LTD. d/b/a TMT BULK :
CORPORATION OF PANAMA, :
                                    :
            Plaintiff,              :
                                    :
            -v-                     :
                                    :
TRANSFIELD ER CAPE LTD. and         :
TRANSFIELD ER LTD.,                 :
                                    :
            Defendants.             :
------------------------------------ x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED: 11/6/10
```

10 Civ. 5110 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.

Pending before the Court is the motion of defendants'
Transfield ER Cape Ltd. and Transfield ER Ltd. to vacate the Court's
ex parte Order of Attachment dated July 2, 2010 and to dismiss the
plaintiff's Verified Complaint. After full consideration of the
parties' briefs and oral argument, the Court hereby grants the motion
in its entirety. However, final judgment dismissing the Complaint
will not be entered until the Court issues an Opinion setting forth
the reasons for this ruling. In the interim, further proceedings in
the case are stayed.

            SO ORDERED.

                                    JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       November 5, 2010

# Exhibit 10

31  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S.$ 38,750 - (Thirty Eight Thousand Seven Hundred*
32  *and Fifty Dollars) daily including overtime, payable every 15 days in advance* .... United States Currency per ton-on-vessels-total-deadweight
       carrying capacity, including bunkers and

33  ~~Heavy etc~~ ............................ ~~common-Bunkers-0, per Calendar Month~~, commencing on and from the *first day of her delivery, as aforesaid*, and at
34  and after the same rate for any part of *a day* needing hire to continue until the hour of the day of her re-delivery is like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outboard sea pilot or passing Pios safe port South Japan (incl North*
       *of Tokyo Bay) and always excluding Japan Sea Side / Singapore Range including South Korea, P.R. China and Taiwan,*
       *Indonesia, Malaysia, Philippines or in Charterers' option Skaw/Passero Range including U.K. and Eire or in Charterers' option*
       *Aden/Muscat Southbound Range, any time day, night, Sundays and Holidays included* ...... ............ ...............

56  ...... ............ ............... ............ ...... unless otherwise mutually agreed Charterers-to-to-give-Owners-not-less-than- ..... days
57  notice of vessels expected date of re-delivery, and probable pos.
58  5. Payment of said hire to be made in *Sea Clause 38 New-York* in cash in United States Currency, *every 15 days* semi-monthly in advance, and for
       the last half month or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise falling the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from subcsel's *delivery* ?-am, on-the-working-day
63  following-that-on-which-written-notice-of-readiness-has-been-given-to-Charterer-or-their-Agents-before-4-pm, but-if-required-by-Charterers,-they
64  to-have-the-privilege-of-using-vessel-at-once, such-time-used-to-count-as-hire.

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, *unless authorized*
       *and approved by Owners*, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire The Charterers, however, shall in no way be responsible for the application
67  of such advances
68  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except-at-such-places-where-it-is-customary-for-similar-size-vessels-to-safely
70  lie-aground.
71  7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers-have-the-privilege-of-passengers-as-far-as-accommodations-allow, Charterers
74  paying Owners- ...............  ... ...........per-day-per-passenger-for-accommodations-and-meals. However, it-is-agreed-that-in-case-any-fine,-or-extra-expenses-are
75  incurred-in-the-carriage-out-of-the-carriage-of-passengers,-Charterer-are-to-bear-such-risk-and-expense *No passengers allowed.*
76  8 That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and equipment.
77  bous The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim and *discharge* the cargo at their expense under the supervision of the Captain, who is to sign or *is to*
       *authorise Charterers' Agents to sign* Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts
80  9 That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10 That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and meat free as provided for Captain's table, Charterers-paying-at-the
84  rate-of-$1.00-per-day-Owners-to- victual-Pilots-and-Customs-Officers, and-also,-when-authorised-by-Charterers-or-their-Agents,-to-victual-Tally
85  Clerks,-Stevedore's-Foreman,-etc, Charterers-paying-at-the-current-rate-per-meal,-for-all-such-victualling. *(See Clause 60).*
86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of such Log, showing the course of the vessel and distance run and the con-
89  sumption of fuel
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13. That-the-Charterers-shall-have-the-option-of-continuing-this-charter-for-a-further-period-of- ... ...... .... ............ ...............
92  ...... ............ ...............
93  on-giving-written-notice-thereof-to-the-Owners-or-their-Agents- .... ...... .... ... days-previous-to-the-expiration-of-the-first-named-term,-or-any-declared-option
94  14. That if required by Charterers, time not to commence before *00:01 hours local time 1st November 2008*. ...... and should vessel
95  not have given written notice of readiness on or before *23:59 hours local time 30th November 2008* but-not-later-than-4-pm. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time from *deficiency, sickness, strike, accident or default of Master, Officers or crew or deficiency of*
       men or stores, fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all expenses directly relating to the vessel*
       *incurred including bunkers consumed during period of suspended hire shall be for Owners' account*, and if upon the voyage the speed
       be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire *upon completion of vessel's employment and with all relevant log abstracts*
       *received by Charterers*.
102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property

6

107    17 That should any dispute arise between Owners and the Charterers, the matter in dispute *howsoever based*` shall be referred to three persons *in London in New York,*

108    one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of *the umpire* any two of them, shall be final, and for
109    the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *conversant with shipping matters. (See Arbitration Clause). English Law to apply in both substances and procedure.*

110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111    -age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112    deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113    might have priority over the title and interest of the owners in the vessel.
114    19 That all dundlate and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115    Crew's proportion *In case of property Owners and Charterers to share equally return of salvage.* General Average shall be adjusted, stated
       and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116    York-Antwerp Rules *1976 as amended 1994 in London* 1924, at such port or place in the United States as may be selected by the master, and as to

...

173    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
132    20 Fuel used by the vessel while off hire, *to be for Owners' account.* also the cooking, condensing water, or for grates and stoves to be agreed to as to
       quantity, and the

134    cost of replacing same, to be allowed by Owners
135    21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137    time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138
139

142    Owners also to provide on the vessel *free of expense sufficient electric lighting with vessel's lights clusters to permit work at hatches and over board at the same time.*

151    24 It is also mutually agreed that this Charter is subject at all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153    etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154    of which are to be included in all bills of lading issued hereunder:
155                          U.S.A Clause Paramount

136    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
137    18, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging.

170   26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171   navigation of the vessel, *acts of pilots*, insurance, crew, and all other matters, same as when trading for their own account
172   27. A commission of *1.25* 3—1/3 per cent is payable by the Vessel and Owners to *Messrs. Ifchor Capes S.A., Lausanne,*
173    ............
174   on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175   28. An address commission of *3.75* 3-1/3 per cent payable to *the Charterers* .... ......... ... .. on the hire earned and paid under this Charter

*Additional Clauses No. 29 to No. 87, as attached hereto, to be fully incorporated in this Charter Party.*

      *THE OWNERS :*                    *THE CHARTERERS :*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or and user as appropriate and not by the author

000374